[No. C.D. 5706.   En Banc.   July 18, 1974.]

*In the Matter of the Disciplinary Proceeding Against*
ROBERT G. KERR, *an Attorney at Law.*

[See 7 Am. Jur. 2d, Attorneys at Law § 17.]

*Robert G. Kerr,* pro se.

*Michael E. Jacobsen,* for Bar Association.

WRIGHT, J.—This matter concerns the discipline of Mr. Robert G. Kerr, a member of the bar of the state of Washington. Kerr, respondent herein, was admitted to practice in this state on the 23rd day of February 1965 and at all times since has practiced and resided in the county of Pierce.

Respondent does not come with a clean record. He had heretofore received a censure dated April 12, 1971. That censure was based upon three items of misconduct, admitted by respondent, growing out of his representation of one J. E. Miller in a child custody proceeding in Pierce County Superior Court.

The first item upon which the censure was based was the attempt of respondent and his client to place an electronic listening device in the office of Mrs. Helen Zylstra, executive director of the juvenile court services in Pierce County. Respondent learned his client's former wife had an appointment with Mrs. Zylstra. Respondent supplied the listening device. Respondent, his client, and the client's second wife, Vivian Miller, went (with the device) seeking an interview with Mrs. Zylstra, who refused to meet with

them. They then sought to enter by the back door, but were unsuccessful. The intent both in seeking the interview and in seeking to enter by the back door was to secrete the device.

The second item upon which the censure was based was an outgrowth of the same proceeding. Respondent made an affidavit in that proceeding stating in substance that his client's former wife, Dorothy Miller, had obtained a California decree which granted her custody upon perjured testimony, and that she was living in Pierce County with a paramour. The matters in the affidavit were not known to respondent. Further, he continued to represent Miller, despite having filed the affidavit.

The third item upon which the censure was based also grew out of the Miller matter. Miller had delivered to respondent the sum of $900 in trust to employ an investigator. Later, Miller orally told respondent he could draw upon the $900 to pay for his services. When respondent told Miller the fund had been exhausted, the latter demanded an accounting, in December 1966. No accounting was furnished until respondent gave one to the Pierce County Local Administrative Committee in August 1968.

One item on the accounting read: "Conference, client and Mrs. Zylstra, 4 hours, $200.00."

Actually, respondent admitted the conference lasted between 1/2 and 1 hour, and that was the only such conference that had taken place. The panel found $50 was a proper charge, and thereafter respondent refunded $150 to Miller by check, dated January 21, 1971.

The panel further found the affidavit was made as a result of inexperience, without fully considering its effect, and without understanding the impropriety of continuing to represent Miller after having made the affidavit.

Other than the above matter, there had been no disciplinary action until the matters which gave rise to this proceeding.

This proceeding is based on four separate matters.

FIRST ITEM OF COMPLAINT

This complaint was made by one Ed Garner and his mother, Evelyn Garner. Essentially this complaint alleges an overcharge for services rendered to Ed Garner, for which services Mrs. Evelyn Garner agreed to pay.

Ed Garner, a narcotics addict in his early thirties, was in the Pierce County jail in 1968. He had been brought from Minneapolis, Minnesota, under the authority of the Washington State Board of Prison Terms and Paroles, for a violation of parole. The violation was based upon a conviction for assault in Minneapolis, for which he had served 4 months in jail.

Respondent was consulted by Garner. Respondent made a plan to have Garner sent to a narcotic rehabilitation center, probably in Fort Worth, Texas. Respondent explained to Garner that such a plan would require an order from the United States District Court and the approval of the board of prison terms and paroles. Respondent explained the plan and the steps necessary to carry it out to Garner.

Respondent said his fee would be $1,500 payable in advance. Garner did not have the money, but suggested his mother would give a mortgage on her home to secure payment. She did sign a note and mortgage for $1,500 payable at $29 per month. Respondent immediately sold the note and mortgage to one George Dixon, a former associate, for $1,050. Respondent received the payments and forwarded them to Dixon. On September 10, 1972, the balance due on the note and mortgage was $482.02.

Garner and his mother contended respondent had guaranteed results, which respondent denied. The hearing panel believed respondent and found there was no guarantee.

Respondent did do a substantial number of things in furtherance of his plan for Garner. He obtained an oral commitment from a member of the board of prison terms and paroles to approve the plan. He also talked to the board chairman, to an employee of the board, and to people at the reception center in Shelton. He secured the approval of the

United States District Attorney. He obtained the services of Nicholas A. Godfroy, M.D., who examined Garner and issued a report stating Garner needed treatment for narcotics addiction.

Respondent was not present at the hearing before the board in Shelton in February 1969. It appears his absence may have been due to misinformation given him by a state employee as to the date of the hearing. The hearing was before board members other than those with whom respondent had had communication. In any event the plan was not approved.

The board stated the recommendation of respondent had been considered even though he was not present. Garner received a minimum term of 7½ years. Garner wrote and accused respondent of doing nothing. Respondent sent a detailed list of what he had done and Garner apologized. Thereafter, respondent did little or nothing for Garner. Garner was released from the state penitentiary at Walla Walla, Washington, in February 1972, but not through any effort by respondent.

Respondent had offered to the local administrative committee to refund any part of the fee the committee felt proper. That offer was never answered by the committee. The hearing panel concluded the fee charged was excessive and ordered a reduction by one-half to $750. Respondent complied and satisfied the mortgage together with a refund to Mrs. Garner of a sufficient sum to reduce the fee to $750.

The hearing panel recommended a reprimand on this item. The disciplinary board concurred.

SECOND ITEM OF COMPLAINT

This complaint was made by John J. Majeres, Robert T. Atkinson, and The Honorable Bertil E. Johnson. Essentially, this complaint deals with the allegation respondent contacted the client of another attorney, and sought to render services to such client without the approval of the attorney.

One Charles David Nash, charged in Pierce County with

unlawful possession of marijuana, had appointed counsel to defend him in that matter. Nash was not unknown to law enforcement; his FBI record covered four pages. Respondent was then representing Nash as to pending charges in King County, and also had previously represented Nash. Respondent went to see Nash in the Pierce County jail. While he was there Nash mentioned the Pierce County charge and showed respondent a letter from his appointed counsel, John J. Majeres. Respondent said Mr. Majeres was properly representing Nash.

Later respondent claims to have attempted to contact Mr. Majeres. He did not contact him, but did have a conference with Nash and then went to see the deputy prosecuting attorney who was in charge of that case. He discussed the possibility of settlement of the charges pending in Pierce County. He said he would possibly receive a fee of $5,000 if he could settle all of the cases pending against Nash. The deputy prosecuting attorney, Mr. Robert T. Atkinson, refused to enter into any compromise.

There was an incident wherein Nash telephoned Mr. Majeres and said he wanted to waive a jury trial. He was told to come to the courtroom and make the waiver in open court, which he agreed to do. Nash did not appear at the appointed time. Respondent was seen in the courthouse corridor at that time. The waiver of jury trial was later rescinded.

The hearing panel held respondent should not have contacted Nash with regard to the matter in Pierce County and should not have taken any part therein without the prior approval of Mr. Majeres. A reprimand was recommended, in which the disciplinary board agreed.

THIRD ITEM OF COMPLAINT

This complaint was made by one Charles Lee Edwards. Essentially, this complaint deals with taking possession of an automobile belonging to Edwards, selling it to respondent's partner, and failing to account.

Edwards was a member of the United States Army, was

stationed at Ft. Lewis, and held a rank of E-4. Edwards was arrested June 8, 1969, and charged with loitering and grand larceny. An attorney, Mr. Gary Cronk, was appointed. Mr. Cronk and respondent were office associates. Respondent was requested by Mr. Cronk to go to the jail and talk to Edwards, and he did so. Respondent questioned Edwards and told Edwards his right to appointed counsel was doubtful. Edwards agreed to retain respondent with a fee of $1,500 with $500 down. Edwards attempted to get funds from his family in Texas, but was unsuccessful.

Edwards had a substantial equity in a 1969 Pontiac automobile. He agreed to assign that to respondent as security and further signed an agreement whereby if the fee were not paid, respondent could sell the vehicle and apply the proceeds of the sale to the fee and costs. The vehicle had been impounded after the arrest of Edwards. On June 11, 1969, respondent took possession of the vehicle and took it out of impound.

Edwards was released to the military authorities on the same day. He immediately demanded possession of his automobile from respondent and was told he could have the vehicle if he would pay the fee. Edwards did not bring in the money and a dispute arose between him and respondent. Soon after that, Cronk paid off the $1,762 balance against the automobile and purchased it for himself. Within a short time Cronk sold the vehicle to his neighbor for $2,250; the market value was $2,800.

Edwards had some clothing in the vehicle. Such items are in the possession of respondent and will be delivered to Edwards at any time. Edwards claimed the clothing was worth $280. The hearing panel found the value to be little or nothing.

Respondent was employed to get Edwards out of jail and back to the military as soon as possible, and then delay the matter until early September 1969 when Edwards was scheduled to be, and was, discharged. The principal purpose was to avoid further prosecution by the military authori-

ties. In this respondent was successful. Upon his discharge Edwards left the area and several warrants are outstanding for his arrest. All that respondent received for his successful representation of Edwards was $200 received from Cronk either in cash or as a credit on rent.

The hearing panel recommended reprimand and the disciplinary board agreed. The reprimand was based upon respondent's failure to properly account to his client, and dealing in his client's property for personal benefit or gain.

FOURTH ITEM OF COMPLAINT

This complaint was made by Mrs. Dorothy Gentry. Essentially, this complaint involved misuse of money placed with respondent in trust, and seeking to take advantage of a layman who was not represented by counsel.

On December 21, 1969, one Thorsten Gastgivar died, leaving a will naming Dorothy Gentry as nonintervention executrix. She was a stepdaughter of deceased. On December 29, 1969, Mrs. Gentry employed respondent to probate the will. This was respondent's first attempt to handle a probate.

Because of one matter of respondent's conduct, it is necessary to briefly state the background of the Gastgivar probate. Dorothy Gentry was the daughter of Hazel Gastgivar, deceased wife of Thorsten Gastgivar, who had died July 14, 1968, leaving as her only heirs her husband and her daughter. Mrs. Gentry had filed a relinquishment and waiver of all interest in the estate of her mother and a request that all of the assets go to Thorsten Gastgivar. The decree of distribution in King County probate No. E-195904 distributed to Thorsten Gastgivar all of the assets of the estate, "together with any property not now known which may belong to said estate."

Thorsten Gastgivar was a member of the Masters, Mates & Pilots Association, a union, which had death benefits for members. In the case of this deceased, the death benefit was $7,500 payable to the named beneficiary, David O. Gastgivar, a brother of deceased.

The union had no address for the brother other than Albany, New York and could not deliver the check to him. When the union learned from the funeral home that respondent was attorney for the estate, they sent to him the check dated January 20, 1970, payable to David O. Gastgivar for $7,500. The letter dated January 21, 1970, accompanying the check read as follows:

Re: Thorsten V. Gastgivar, deceased.
Having received a certified copy of the death certificate from the Seattle representative of the MMP Local 90, we have processed a claim for death benefit payable for the above noted deceased licensed deck officer on behalf of his named beneficiary, David O. Gastgivar, brother. The only address noted on the enrollment form for this brother was Albany, New York.
In view of the fact that you are handling the estate as indicated on the copy of the funeral expenses received, we are forwarding the death benefit to your office for delivery to the named beneficiary. We also wish to state that this benefit is not a part of Mr. Gastgivar's estate.
Please be advised that there are additional benefits payable which would be a part of the estate and upon receipt of a copy of the court appointment of an executor, we can process a claim for benefits.

Again, on February 9, 1970, the union wrote to respondent as follows:

Re: Thorsten V. Gastgivar, deceased.
On January 21, 1970 we forwarded to your office a death benefit for the named beneficiary of the above noted deceased licensed deck officer.
If you have contacted the above noted deceased officer's beneficiary, one David O. Gastgivar, his brother, we would appreciate hearing from you, and that you have forwarded the death benefit to the beneficiary.
Also noted in our letter was a request for a copy of the court appointment of an executor. If the court has appointed an executor, we would appreciate receiving a copy of this appointment.

Respondent was thus clearly advised the check was no part of the estate of deceased, and that he was given the

check for the sole and only purpose of delivery to the beneficiary.

Respondent apparently left the check exposed on top of his desk and a few days later another client of respondent, one Joseph V. Agosto, was in the office and saw the check. Agosto did not know Gastgivar, but stated he would undertake to locate him for respondent. Very soon thereafter, by means known only to Agosto, he located Gastgivar in a jail in Albany, New York.

David O. Gastgivar was a chronic alcoholic and was mentally unable to properly conduct his own affairs. He was then in jail since November 5, 1969, and before that had been undergoing a sentence which caused his imprisonment from July 27, 1969, to October 29, 1969. During the preceding 6 months he had been out of jail approximately 1 week.

Agosto and respondent went to Albany, New York, by air, leaving Tacoma on February 14, 1970. Respondent did not take the check with him. In jail, respondent told Gastgivar he had a "draft" for $7,500 for a death benefit, and that the estate of deceased had a claim on the money. He entered into a rather extended discussion of the community property laws of the State of Washington. He represented the estate might or might not win in court, and that litigation would take some time, which he estimated to be at least 4 months. He said he had authority to settle on the basis of one-third, or $2,500 to the estate and the balance to the beneficiary.

After some discussion, Agosto and respondent went to a hotel in Albany and there Agosto typed several documents, including a power of attorney to Agosto to cash the check. They also had some documents which respondent had brought with him from Tacoma. Gastgivar signed all of the documents and a notary public was obtained to take the acknowledgments.

The agreements in substance provided Agosto was to receive the $7,500 and was to deduct from that sum expenses he had incurred in the matter, the $2,500 for the

estate, and all other expenses. The balance Agosto was to hold as security if he secured a bond for the release of Gastgivar; if not, he was to deposit the balance in his name in a bank and hold it for the benefit of Gastgivar.

After the various papers were signed, Agosto and respondent returned by plane to Tacoma.

Agosto, in fact, deposited no part of the $7,500 in the bank account for the benefit of David O. Gastgivar. Instead, he did deposit it in the bank account of one of his business ventures, which account was theretofore overdrawn.

Five days later, on February 20, 1970, the petition for probate of the last will and testament of Thorsten Gastgivar was filed in King County under probate No. 201977. Mrs. Gentry was appointed executrix, and other matters done included appointment of an appraiser and granting of a family allowance.

On March 12, 1970, David O. Gastgivar was released from jail without the need for posting bail or other security. In April he came to Tacoma. He wanted his money. Gastgivar could get absolutely no satisfaction from respondent. He located Mrs. Gentry. She did not have the $7,500, or any part of it.

Gastgivar employed counsel to get his money. Demand was made on Agosto and eventually an accounting was made which Gastgivar accepted. In that accounting Agosto took credit for the $2,500 paid to the estate, although in fact, it was not so paid, but was retained by Agosto. Gastgivar made continued demands upon Mrs. Gentry and threatened her. Mrs. Gentry and her husband called upon Agosto, who threatened Mr. Gentry with a knife. After much difficulty, Gastgivar received at least a substantial part of the money.

The disciplinary board by its order dated January 22, 1974, changed the hearing panel's recommendation from a reprimand to suspension from the practice of law for a period of 60 days.

CONCLUSION:

Respondent had no legal basis for claiming a part of the death benefit for the estate. His conduct was wrong in seeking to confuse the beneficiary, David O. Gastgivar, by a discussion of community property law, which was wholly inapplicable to the situation.

He had received the funds specifically to convey them to David O. Gastgivar. If he could not do so, he should have promptly returned the check. It is improper for an attorney to take trust funds of one client for the benefit of another client. He had no right to leave Agosto in possession of funds belonging to David O. Gastgivar. His conduct in that regard was inexcusable.

■ We are firmly committed to certain principles in connection with disciplinary proceedings. (1) The final responsibility and authority in such matters rests with the Supreme Court. (2) The court will give respectful consideration to the recommendations of the disciplinary board, but not be bound by the same. (3) All recommendations of the disciplinary board and of the hearing panel are for the guidance of the court and are only recommendations. *In re Espedal*, 82 Wn.2d 834, 838, 514 P.2d 518 (1973) states:

> We always give serious consideration to recommendations of the Board in disciplinary proceedings. Nevertheless, they are only advisory. The ultimate responsibility for determining the nature of discipline rests solely with this court. *In re Kennedy*, 80 Wn.2d 222, 240, 492 P.2d 1364 (1972).

*Accord, In re Smith*, 83 Wn.2d 659, 663, 521 P.2d 212 (1974).

Having fully considered the recommendations of the disciplinary board, the court finds no valid reason for not adopting the same as to items one, two and three. As to the fourth item, the court finds the recommendations of the board to be inadequate, and that a suspension from the practice of law for 6 months would be a proper penalty.

It is, therefore, ordered, that Robert G. Kerr receive reprimand on each of the first three items of the complaint.

On the fourth item of complaint it is ordered that respondent, Robert G. Kerr, be suspended from the practice of law for a period of 6 months. The respondent shall pay the costs of this proceeding.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, UTTER, and BRACHTENBACH, JJ., concur.