[L.A. No. 30322. In Bank. Nov. 22, 1974.]

ARTHUR TOLL, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Harold Rhoden for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## Opinion

THE COURT.—On application of Arthur Toll, a member of the State Bar, we issued our writ of review of a recommendation of the Disciplinary Board of the State Bar (the Board) that petitioner be disbarred from the further practice of law. The Board's recommendation is based on findings which are almost identical in substance to those of a local administrative committee of the State Bar (the committee) which conducted hearings in 1972 on charges that petitioner had violated his oath and duties as an attorney and counselor at law (Bus. & Prof. Code, §§ 6067, 6068, 6103) and had committed acts involving moral turpitude, dishonesty and corruption (Bus. & Prof. Code, § 6106). The substance of the findings is that petitioner participated in making bribes in connection with obtaining a zoning change and thereafter engaged in other dishonest conduct in an attempt to thwart investigation of the bribes. The committee recommended that petitioner be publicly reproved.

Petitioner first denied all charges of wrongdoing but immediately prior to the hearing filed an amended answer in which he admitted each allegation of the charges. He has not disputed his culpability in these proceedings and concedes that his conduct was "reprehensible" and involved "moral turpitude, dishonesty and corruption." He argues only that the discipline recommended by the Board is excessive.

Although petitioner has thus conceded his misconduct it is nevertheless incumbent upon us to examine the factual record in order to judge the degree of culpability and the appropriate discipline. We adopt the findings of the Board as reflected in the following factual recitation, except as hereinafter specifically noted.

After practicing law in the State of Ohio beginning in 1950, petitioner was admitted to the State Bar of California in 1959 and since that date has been a member in good standing without prior disciplinary proceedings had against him. While practicing law in Ohio he had served as assistant attorney general for the largest county in that state, chief counsel for a congressional subcommittee, and executive secretary to the director of highways. The latter position was described as "sensitive" in that it involved expenditures of millions of dollars, the supervision of 10,000 employees and dealings with "contractors, materialmen, patronage and public policy."

Petitioner's California practice consisted principally of litigation in the areas of corporate securities and business matters. In March 1964 petitioner agreed to act as counsel for a partnership involved in the develop-

ment of real property in Canoga Park in the City of Los Angeles. As a fee he received a 5 percent nonvoting interest in partnership profits.[1] The partnership was controlled by Wallace White and Joseph Arnoff. Petitioner had a long-standing social and attorney-client relationship with the latter named individual. Previously Arnoff had been a very wealthy man but in 1964 he was experiencing financial difficulties. Prior to the formation of the partnership an application for a zoning change affecting property acquired by the partnership upon its formation had been rejected by the Los Angeles City Planning Commission. In May 1964 petitioner, Arnoff and others met with Arnoff's close friend, Los Angeles City Councilman Thomas Shepard, regarding the rezoning of the property which was located in the district represented by Shepard. The councilman indicated at the meeting that he approved the partnership's plans for the development of the property and that he would cooperate in effecting the rezoning necessary for such development. In June 1964 an appeal from the earlier rejection of the zoning change application was filed on behalf of the partnership with the Los Angeles City Council.

While the appeal was pending petitioner was advised by the fourth member and acting accountant for the partnership, Gerald Chase, that Shepard wanted to borrow $10,000 and that Arnoff wanted to make the loan from partnership funds. The accountant prepared a promissory note and arrangements were made by him whereby a third party would borrow the money from the partnership and the latter in turn would lend the $10,000 to Shepard. As explained to petitioner by Arnoff, the third-party arrangement was utilized because Arnoff felt that he would be uncomfortable if it became necessary to make a direct demand on his friend Shepard for repayment of or for interest which might become due on the note.

Petitioner prepared a letter to Chase in July 1964 authorizing the withdrawal of $11,000 of partnership funds for the third-party loan.[2] The withdrawal of the additional $1,000 was represented to petitioner to be for accounting expenses owed the accountant, but it appears that the addi-

---

[1] Petitioner was to participate only after others who had made contributions to the venture (land and $250,000 in cash) had been fully reimbursed from profits.

[2] The text of the letter is as follows: "I've been instructed by Wally White and Joe Arnoff to write to you authorizing the withdrawal of the total of $11,000 of partnership funds from the Union Bank. You are instructed to lend $10,000 to Ivan Stone for one year with interest at the rate of 5% per annum. You may withdraw an additional $1,000 for expenses, making a total of $11,000 withdrawal.

"Please obtain a promissory note from Mr. Stone in the amount of $10,000 with the provision for attorney's fees in the event the suit is instituted to collect. You are authorized to retain possession of the note in your files on behalf of the partnership."

tional sum was actually given to Shepard to be returned as interest on the loan. Petitioner testified before the committee that he purposely did not make inquiry into the details of the transaction, as "I was afraid of what I would find." He further testified that he believed at the time of the hearing that the transaction would constitute a bribe if it was intended to influence Councilman Shepard, but that at the time of the loan he did not believe the transaction was in response to a solicitation by Shepard for a bribe. Petitioner stated that he believed that Shepard was already committed to support the zoning change. He conceded, nevertheless, that he thought the loan would have influenced Shepard not to change his mind and that he "avoided drawing conclusions" which he should have drawn.[3]

In August 1964, on the recommendation of Councilman Shepard, the Los Angeles City Council passed an ordinance which rezoned the property as sought by the partnership. However, in October, the zoning ordinance was vetoed by the mayor. The partners had borrowed funds for financing the development and had commenced construction prior to the veto which came as a great shock to them. At a meeting to consider a course of action White advised the partners that an unnamed person had offered to procure a reversal of the veto in exchange for the sum of $21,000. Arnoff was outraged and felt that the veto was a prelude to extortion. He nevertheless sought petitioner's approval for payment of the $21,000. Petitioner was aware that notwithstanding the question of extortion, the payment of the $21,000 would be unlawful. Under great pressure from Arnoff, who would be financially "wiped out" if the property was not rezoned, petitioner advised that the payment would be a "bad thing," but he did not otherwise object to payment of the bribe. The partners planned each to make a withdrawal of partnership funds as a contribution to the bribe money. Although petitioner again objected and stated that he did not want to participate, he nevertheless made a $2,500 withdrawal and gave the money to White for the purpose of using that money and the contributions of the other partners to effect a withdrawal of the veto. Petitioner testified that he had no doubt that his participation in the scheme was unethical. In November 1964 the mayor's veto was withdrawn, the mayor stating publicly that the

---

[3]In an "Opinion of Committee," expressly made a part of the committee findings, the following appears: "Notwithstanding [petitioner's] admission (by way of his amended answer) there is a significant question as to his actual moral culpability. Arnoff and Shepard were also close personal friends and Arnoff had been a significant contributor to Shepard's campaign. There was never any discussion concerning money between [petitioner] and Shepard. Moreover, Shepard already [had] stated that he would vote in favor of the proposed zoning change. [Petitioner's] conduct at that point in time was entirely passive. As an attorney, [petitioner] did have a duty to take affirmative action to stop the transaction."

ordinance was "good zoning" and "shouldn't have been vetoed in the first place."[4]

Three years later, in October 1967, petitioner learned that an investigation of Shepard's conduct by the Attorney General's office was underway and that Ivan Stone (see fn. 2, *supra*) had been questioned about the "loan" he had made to Shepard. The partnership's accountant, Chase, who had possession of the note, suggested that an effort be made to collect it in order to give the "loan" transaction the appearance of propriety. He further suggested that the effort to make a collection should appear to predate the partners' knowledge of the ongoing investigation. Arnoff agreed to assign the note to petitioner and Chase, apparently in discharge of professional fees owed to them. Accordingly, the note was forwarded to petitioner with a predated memo indicative of an earlier assignment and petitioner wrote a letter of demand to Shepard bearing an earlier date in 1967. Petitioner admits that such activity was a "cover-up."[5]

Petitioner's claim that disbarment is not warranted is not grounded in an effort to excuse himself. He concedes that his wrongdoing as to both bribes and the attempted cover up was without justification. He argues, however, that because of particular circumstances giving rise to his misconduct and other matters in mitigation his culpability does not warrant disbarment. The particular circumstances are his prior close relationship with Arnoff, the extremely adverse impact the failure to obtain rezoning would have on Arnoff's financial position, the negligible financial gain which petitioner might personally realize, his opposition to the planned misconduct and his capitulation only because of the pressures exerted on him to protect his close friend. Petitioner asserts in mitigation that after his copartners had lied to investigators on several occasions, he took a firm stand against their demand for his cooperation in the cover up and, after he gave a truthful statement to the investigators, his copartners recanted their earlier fabricated versions of the events. He also urges that he has been active in legal, civic and religious organizations[6] and has otherwise, both before and after his misdeeds, conducted himself in a manner consistent with the highest moral standards and the ethics of his profession.

---

[4]According to the testimony of the prosecutor who successfully tried Shepard on criminal charges the $21,000 was traced through the hands of persons in the city government, but it was never learned who ultimately profited therefrom.

[5]Apparently no effort had been made to collect the note prior to petitioner's 1967 letter. Shepard, after rejecting several demands, repaid the $11,000 to Arnoff the day before he was tried on criminal charges.

[6]These include the Beverly Hills Little League, the Beverly Hills Municipal League, the United Jewish Welfare Fund, the Century City and Beverly Hills Bar Associations.

Petitioner has presented an impressive list of character witnesses on his behalf. An appellate justice of·a sister state testified that he had personal confidence in petitioner's competence and integrity, even in view of the admission of the charges. Calling on his judicial experience in evaluating the degree of wrongful professional conduct, the justice stated that although petitioner had made a serious error in judgment, he had "learned his lesson" and if allowed to.practice "the public interest will be protected, and the profession will not be damaged and I think that he will not make an error judgment or violate the Code of Professional Ethics again. As a lawyer I have every confidence in him." This view is supported by a second appellate justice from the same state, who described petitioner's actions as "more an error of judgment than any type of crime or anything."

The deputy district attorney who successfully prosecuted Councilman Shepard on criminal charges was of the view that petitioner "had not used his position as an attorney to create or engineer what ultimately occurred in the case" and that although petitioner exercised poor judgment, his actions did not warrant disbarment.

The attorney who represented the copartners during the official investigation testified that throughout the investigation petitioner was interested in having the whole truth exposed.

Many other attorneys who had dealings with petitioner testified that he had an excellent reputation in the legal community for honesty and integrity and was a highly competent lawyer. Most of such attorneys felt that petitioner had made a one-time error of judgment. One stated that petitioner "had engaged in an unfortunate mistake out of some misguided loyalty . . . to a very demanding client." In addition to the character witnesses, petitioner offered 16 favorable letters of reference, 15 of which were written by attorneys and 1 by a superior court commissioner.

▆▆ It is manifest that whatever lesser degree of culpability may be assigned because of petitioner's somewhat passive participation in the Shepard bribe, there is no question that he knowingly and actively participated in the second bribe and in the scheme to thwart the investigation and that he did so with the subjective knowledge that he was then engaging in criminal conduct. Such conduct cannot be excused because of petitioner's many years of exemplary conduct either prior to or subsequent to that time. Nor can petitioner's conduct be fairly characterized as a one-time exercise of poor judgment, however extenuating the circumstances. Petitioner, by his own admissions, at least suspected the wrong-doing beginning in July 1964. In October he participated in what he clearly understood to be the giving of a bribe and then, after a three-year period during which

he could evaluate the propriety of his conduct, he again chose to commit another wrongful act in the hope of concealing the prior misconduct. Although petitioner thereafter made full disclosure to the investigating authorities, it was only after the investigation had reached those implicated with him and, we must conclude, threatened to expose him. We are persuaded that under these circumstances the best interest of the law will not be served by dismissing petitioner's conduct with a public reproval.[7]

Petitioner urges in an effort to avoid disbarment as recommended by the Board that we should accord greater weight to the findings of the committee, citing *Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 701 [108 Cal.Rptr. 806, 511 P.2d 1158]. The committee's finding particularly relied on by petitioner is that expressed in its incorporated opinion that petitioner's misconduct was "completely out of character."[8] In view of the greater opportunity of the committee to observe and judge the credibility of the attorney charged with misconduct, great weight must be given to their findings. (*Black* v. *State Bar* (1972) 7 Cal.3d 676, 683-684 [103 Cal.Rptr. 288, 499 P.2d 968].) We find, accordingly (see *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993]), that on the totality of the record petitioner's conduct was out of character, as also found by the committee.

Although the committee's as opposed to the Board's *factual findings* are entitled to the greater weight, it is the Board's recommendation in matters of the *discipline* to be imposed which is to be accorded the greater weight. The final word as to discipline, of course, rests with this court, and "[p]etitioner has the burden of showing that the Board's recommendation is erroneous or unlawful. [Citations.]" (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 450 [113 Cal.Rptr. 602, 521 P.2d 858].)

Petitioner urges that, as viewed by him, more culpable misconduct in other cases has been accorded lesser punishment than that recommended by the Board. It is established, however, that each case must be decided on its own facts (*Yapp* v. *State Bar* (1965) 62 Cal.2d 809, 818-819 [44 Cal.Rptr. 593, 402 P.2d 361]), and it avails us nothing

---

[7]Petitioner commendably agrees that public reproval is too mild a discipline. He states in his petition that "For this one incident, Petitioner has always displayed repentance, and though he has already suffered an extreme punishment during these proceedings, he acknowledges that for the good of the Bar—as an example to other attorneys, and therefor for the good of the public—a suspension would be appropriate, in which case he would suffer its humiliation and financial loss."

[8]Although the Board's findings are otherwise substantially in accord with the findings of the committee, the findings expressed in the committee's "Opinion of Committee" are not reflected in the Board's findings.

to attempt to make judgments of comparative culpabilities in varying circumstances.

We have consistently considered, in mitigation of the discipline to be imposed, the circumstances attending the wrongdoing of an attorney and other pertinent matters which bear on the culpability of the conduct in question. There are a number of mitigating factors in the instant case. Petitioner has no prior disciplinary record. (See *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 747 [111 Cal.Rptr. 905, 518 P.2d 337].) He has continued his practice and earned the respect and confidence of his associates after the transactions in question. (See *Yokozeki* v. *State Bar, supra,* 11 Cal.3d 436, 450; *Benson* v. *State Bar* (1971) 5 Cal.3d 382, 388 [96 Cal.Rptr. 30, 486 P.2d 1230].) The long delays in filing the complaint and in processing it may be considered in fixing the discipline. Here seven years elapsed between the charged misconduct and notice of the institution of proceedings, and it was more than two and one-half years thereafter before petitioner received notice of the Board's recommendation of disbarment. (See *Vaughn* v. *State Bar, supra,* 9 Cal.3d 698, 703; *Arden* v. *State Bar* (1959) 52 Cal.2d 310, 321 [341 P.2d 6].) He has cooperated fully in the disciplinary proceedings. (See *Demain* v. *State Bar* (1970) 3 Cal.3d 381, 388 [90 Cal.Rptr. 420, 475 P.2d 652].) He appreciates the seriousness of his misconduct, has clearly demonstrated repentance and established his determination to avoid future transgressions. (See *Bradpiece* v. *State Bar, supra,* 10 Cal.3d 742, 748; cf. *Yokozeki* v. *State Bar, supra,* 11 Cal.3d 436, 451.)

We also weigh in the balance petitioner's cooperation with the Attorney General's investigation of criminal conduct which preceded the institution of the present proceedings, and note that petitioner's cooperation resulted at least indirectly in truthful disclosures by petitioner's copartners.[9]

We are persuaded in view of the foregoing mitigating factors, particularly petitioner's recognition of his wrongdoing and the persuasive recommendations of those who have associated with him since his misdeeds, that disbarment is not necessary in order to afford adequate protection to the public. (See *Hyland* v. *State Bar* (1963) 59 Cal.2d 765, 774 [31 Cal.

---

[9]We do not agree with petitioner's further contention that mitigation may also be premised on his efforts to serve the needs of Arnoff rather than petitioner's personal needs. "It makes no difference whether an attorney acts in a representative capacity for someone else or for himself if he commits acts involving moral turpitude, dishonesty or corruption." (*Lee* v. *State Bar* (1970) 2 Cal.3d 927, 941 [88 Cal.Rptr. 361, 472 P.2d 449].) The record does not disclose that petitioner was so immature that he was dominated by Arnoff to the extent that the latter can be deemed primarily responsible for the misconduct. (Cf. *Bryant* v. *State Bar* (1942) 21 Cal.2d 285, 299 [131 P.2d 523].)

Rptr. 329, 382 P.2d 369].) We conclude, accordingly, that petitioner must be suspended from the practice of law.

It is ordered that petitioner be suspended from the practice of law for a period of three years; that execution of this order is stayed, and petitioner is placed on probation for the three-year period upon condition that for the first year of the probationary period he shall be suspended from the practice of law. It is also ordered that petitioner comply with rule 955, California Rules of Court.

Wright, C. J., did not participate.