[No. C.D. 4130.   En Banc.   March 16, 1978.]

*In the Matter of the Disciplinary Proceeding Against JAMES J. CAPLINGER, an Attorney at Law.*

*Kurt M. Bulmer* and *Jack J. Cullen,* for Bar Association.

*Schweppe, Doolittle, Krug, Tausend & Beezer* and *Alfred J. Schweppe,* for respondent.

DOLLIVER, J.—This is an appeal from the findings, conclusions and recommendations of the Disciplinary Board of the Washington State Bar Association in regard to James J. Caplinger. A 3–member panel held a 2–day hearing and recommended a reprimand for respondent to the board. The board in turn imposed a 1–year suspension from practice. Respondent Caplinger challenges the suspension. Facts giving rise to these proceedings are as follows:

Mary Jones died intestate on May 22, 1968, and 2 years later her daughter, Fredericka Owens requested Caplinger to handle the estate for her. Fredericka Owens had met Caplinger through Jesse Brannon, whom she later married on June 21, 1970. Caplinger initiated proceedings by filing a petition for letters of administration on April 6, 1970. At the time the probate was filed, Fredericka notified Caplinger she was the sole heir and several times made this same statement under oath.

On April 7, 1970, Fredericka Owens signed a quitclaim deed of her interest in the house to a local bonding company. This deed was to be used as a security for the bail bond of a friend of Jesse's and Fredericka's who also was one of Caplinger's clients. The deed was notarized by Caplinger. On December 22, 1970, the bonding company quitclaimed the property back to Fredericka.

At this time, Jesse and Fredericka Brannon asked Caplinger for a loan to repair the Jones' residence so it could be rented or sold. Pursuant thereto, on January 2, 1971, Fredericka signed a statutory warranty deed to Caplinger to be used as security. Beginning January 4, 1971, and for the

next 4 months, Caplinger advanced a total of $7,241 in cash to the Brannons. An additional $3,662.80 for various costs regarding the property and other legal matters was advanced over the subsequent 20 months.

No order permitting the encumbrance on the property was obtained from the court nor was any indication of its existence placed in the estate file. In addition, at no time did Caplinger prepare any documents which would reflect the security nature of the warranty deed, the interest to be paid by the Brannons, the pay–back requirements, or any other matters concerning the agreement. No written accounting was ever provided by Caplinger to his clients.

Caplinger rented the property for $150 per month beginning in March 1971. He signed an earnest money agreement in an attempt to sell the house to the renters in May 1971, but the title report from Transamerica indicated that clear title could not be given and the sale fell through.

On July 9, 1971, Caplinger filed a quiet title action in his own name and purported to remove all interest in the property except Fredericka's.

On August 4, 1971, Caplinger again rented out the house and signed an earnest money agreement to sell to the renter on September 21, 1971. Apparently financing could not be arranged and the transaction was never consummated.

During this period, state inheritance tax was allowed to accrue on the estate. On March 9, 1971, D. L. Cooper of the State Department of Revenue, Inheritance Tax Division, wrote Caplinger notifying him:

> As this estate is 18 months past the interest date, we need it completed as quickly as possible. To this end, we have dated the file to April 22, 1971 to allow you to forward this information. Failure to reply will compel us to contact the Personal Representative to complete this matter.

Apparently this letter went unanswered and D. L. Cooper directed another letter on April 30, 1971, this time to Fredericka Brannon, stating:

We have written your attorney a number of times, requesting that we be furnished an Inventory and Appraisement and an Inheritance Tax Report. To date we have received no response.

We are now writing you directly, since it is your responsibility to see that the necessary information and reports are furnished, and the tax, if any, paid.

You should also be advised that interest has attached and is accruing at the rate of 8% per annum from August 22, 1969 on any tax due.

Please make the necessary arrangements to complete this matter by May 22, 1971.

On July 27, 1971, the following letter was directed again to Caplinger from Cooper of the tax division. It provided:

On May 4, 1971 Mrs. Storms, of this office, advised me that you requested her to ask me for a delay in this estate to June 30, 1971.

I dated the file accordingly, but, as yet, have not received the requested reports and information.

Our only course of action left is to have the court appoint a new Personal Representative. This, of course, we wish to avoid. Therefore, may we have action on this matter.

The record reveals that in September 1971 Caplinger finally did comply with the numerous tax division requests and sent in the inheritance tax report. After the division audit, Caplinger mailed in a check in the amount of $19.29 as payment in full for the tax and interest due. On February 7, 1972, an order was signed distributing the entire estate to Fredericka Brannon.

The judgment quieting title in Caplinger was entered June 21, 1972. On that same date, Mrs. Brannon signed a quitclaim deed granting her interest in the property to Caplinger. This quitclaim deed, as well as the previous warranty deed, was filed by Caplinger on June 22, 1972. Neither contained any reference to the estate's interest in the property.

On November 20, 1972, attorney Fred Winn of San Francisco wrote Caplinger notifying him that he represented Elizabeth Barrett, daughter of the deceased Mary

Jones, and inquired from whom Caplinger had purchased the property. This was the first notice that Caplinger had received that Mrs. Barrett, Mrs. Jones' other daughter, might be alive and have an interest in the estate. Although Caplinger submitted an affidavit claiming to have notified the Brannons of this letter, he failed to respond to Mr. Winn.

Slightly more than a month later, Caplinger borrowed money, using the property as security for the loan. The hearing panel's final finding of fact No. 7, adopted by the board, recites:

> On December 28, 1972, Mr. Caplinger, without prior notice to the Brannons mortgaged the 15th Avenue home to a Seattle lending institution for the principal amount of $8,500. The record is not clear how much cash was actually received from the lender because loan costs and finance charges were subtracted from the loan proceeds. Evidence submitted after the hearing by Caplinger places the net amount received as $7,456.67. Caplinger used part of the net loan proceeds to pay off his own bank loans and the rest went into his office bank account. These amounts were intended by Caplinger to be used as credits against the amounts he claimed due from the Brannons. To date no statement of account has been rendered to the Brannons regarding the amount or disposition of the loan proceeds. None of the money was remitted to Fredericka Brannon or her husband, Jesse Brannon.
>
> At the time Caplinger mortgaged the 15th Avenue property he had actual knowledge through the letter from Attorney Winn of the existence of Elizabeth Barrett, who, as an heir of Mary Jones, deceased, would have an interest in the 15th Avenue property adverse to his own interest therein. He also knew or should have known that because of her claim he was not able to give to the mortgagee a first lien right in unencumbered property. He failed to disclose to the mortgagee that his interest was for security only.

Finding of fact No. 8, entered by the hearing panel, notes subsequent events regarding the property:

On March 26, 1973, attorney Marvin Strasburg of Seattle, Washington contacted Caplinger and told him that he represented Ronald Williams, a grandson of Mary Jones, and he was inquiring into the status of the 15th Avenue property. After unsuccessful attempts to secure a response from Caplinger, Attorney Strasburg, on May 25, 1973, petitioned the King County Superior Court for an accounting of the estate of Mary Jones on behalf of Ronald Williams. It was not brought to the court's attention or to Mr. Strasburg's attention by Caplinger that Elizabeth Barrett was alive until October 17, 1973. No accounting has been offered to the Court to date and that action is still pending.

Ronald Williams is Elizabeth Barrett's son. Finally, finding of fact No. 9 notes mistreatment of amounts collected from the property's various renters from 1971 to date. That paragraph provides, in pertinent part:

From approximately March 1971 to date Caplinger received the majority of the rental payments from the tenants of the 15th Avenue property. Caplinger did not render any contemporaneous accountings to his clients for funds advanced and funds received with respect to the 15th Avenue property. The receipts and disbursements of funds were to some extent at least, commingled in Caplinger's general office account. The first accounting that was furnished was the summary of receipts and disbursements prepared after the complaint and offered at the hearing of this case, which summary is incomplete in material particulars.

After review of the foregoing facts, the Disciplinary Board of the Washington State Bar Association concluded a 1-year suspension of Caplinger would be the appropriate remedial action.

Caplinger argues the 1-year suspension is too harsh a censure when measured against his conduct. Fredericka Brannon signed an affidavit both in the estate proceedings and in the quiet title action asserting that she was the *sole heir* of the property in question. It is Caplinger's position that these false statements, which he had no reason to suspect, were the cause of his problem.

He further contends the disciplinary board's recommended suspension in the face of the hearing panel's recommended reprimand is too harsh. In this regard, the Bar Association refers this court to *In re Krogh,* 85 Wn.2d 462, 536 P.2d 578 (1975), where the disciplinary board recommended disbarment in contravention of the hearing panel's recommendation of a 9–month suspension. In affirming the disbarment, this court adopted the rule set forth in *Toll v. State Bar,* 12 Cal. 3d 824, 831, 528 P.2d 35, 117 Cal. Rptr. 427, 432 (1974):

> Although the committee's as opposed to the Board's *factual findings* are entitled to the greater weight, it is the Board's recommendation in matters of the *discipline* to be imposed which is to be accorded the greater weight.

*In re Krogh, supra* at 472.

Caplinger made an offer of restitution after the disciplinary board entered its final findings of fact, conclusions of law and recommendations. That offer is in the form of a quitclaim deed which would return the property to Elizabeth Barrett, the claimant from California, and to Fredericka Brannon. The quitclaim to Mrs. Brannon is subject to an equitable lien in the amount of $6,828.17 to cover advances made to her for repair purposes.

In response to this proffered restitution, the Bar Association asserts restitutionary matters are irrelevant for purposes of imposing discipline. In *In re Pennington,* 73 Wn.2d 601, 606–07, 440 P.2d 175 (1968), this court reviewed the imposition of a 30–day suspension of an attorney who had misused a client's funds. It was stated therein:

> Moreover, we have repeatedly held that serious personal problems or other extenuating circumstances which may have caused a violation of the Canons do not constitute an excuse for such violations, and further that restitution and repentance following such violations, while commendable, do not constitute a defense to the disciplinary action.

While we agree with the Bar Association that the disciplinary board's conclusions are entitled to greater weight

than those of the hearing panel and that restitution does not constitute a defense, we cannot agree that a 1–year suspension from practice is the appropriate remedy in this circumstance. Our review of recent cases in which we ordered suspension from practice indicates it is a remedy imposed under circumstances involving conduct more egregious than evident here.

In *In re Nelson,* 87 Wn.2d 77, 549 P.2d 21 (1976), we imposed a 60–day suspension. There the respondent's repeated failure to meet court appearances on behalf of a client charged with driving while intoxicated resulted in the client's arrest. Eventually the client was awarded a judgment against the respondent as a result of his nonappearances and negligent handling of the driving–while–intoxicated charge. In addition, the respondent attorney's delay in prosecuting the claim of another client led to the dismissal of the claim. This resulted in the client obtaining a $1,500 judgment which remained unpaid at the time of the disciplinary proceeding. Further, the respondent attorney had collected amounts due another of his clients on a note and failed to remit some of the collected amount to the client.

We concurred with the recommendation of the disciplinary board that there was sufficient cause to suspend Nelson from practice for a 60–day period.

In *In re Livesey,* 85 Wn.2d 189, 532 P.2d 274 (1975), we imposed a 1–year suspension on the respondent attorney. There, we found continued misrepresentations and/or misuse of trust funds in regard to seven different clients. Misrepresentations continued up until the disciplinary hearing held by this court and we found them to be the result of severe emotional disturbances. Because of the number of clients involved and the repeated nature of the misrepresentations, we found the respondent attorney incapable of conducting his affairs in a professional manner and accordingly suspended him.

In *In re Kerr,* 84 Wn.2d 109, 524 P.2d 406 (1974), we imposed a reprimand and 6–month suspension on an attorney who formerly had been censured. Conduct for which we issued the reprimand included inaction in regard to a criminal client; dealing with a client regarding a matter being handled by another attorney; failure to account properly to his client; and dealing in his client's property for personal benefit or gain. We imposed a 6–month suspension for misuse of trust money.

Unlike the above situations, we find no evidence of moral turpitude in regard to respondent Caplinger's conduct. The Bar Association has stated to this court, "No one has suggested that Mr. Caplinger has stolen or misused these funds." There also is no evidence that the interests of his client or others were harmed by the actions of Caplinger. Furthermore, Caplinger has not previously been disciplined and this is the first time his conduct has been under review by the disciplinary board.

■ We neither approve of nor excuse Mr. Caplinger's encumbrancing estate property without court approval. However, we do note evidence that the respondent was attempting to recover advances made to his clients by his mortgage on December 28, 1972. In *In re Fraser,* 83 Wn.2d 884, 523 P.2d 921 (1974), it was stated:

> We recognized in *In re Gowan,* 104 Wash. 166, 176 P. 7 (1918) that a necessary element of a charge of misappropriation of a client's money is the intent to defraud. If an attorney withholds funds under an honest claim of right to them, the offense is not committed. We have also recognized that an attorney need not account for funds which represent the sum due him for attorney fees. *See In re Hall,* 73 Wn.2d 401, 438 P.2d 874 (1968).

*In re Fraser, supra* at 894.

■ Similarly, we do not condone the delay in settling estate taxes, however minimal. Nor is the press of business a sufficient reason not to have answered the San Francisco attorney relative to the claim of Elizabeth Barrett. But, as noted earlier, we do not believe a 1–year suspension is the

proper remedy in this situation. In *In re Nelson, supra,* we reiterated our approach set forth in *In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974). In *Smith* we stated, at page 663:

In making the ultimate determination as to the measure of disciplinary action, we give consideration to: (a) the seriousness and circumstances of the offense, (b) avoidance of repetition, (c) deterrent effect upon others, (d) maintenance of respect for the honor and dignity of the legal profession, and (e) assurance that those who seek legal services will be insulated from unprofessional conduct.

Balancing the facts in this case against the factors we consider in assessing disciplinary actions, we conclude the appropriate remedy in this matter is a reprimand.

It is so ordered.

WRIGHT, C.J., and UTTER, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

ROSELLINI, J. (dissenting)—The Disciplinary Board of the Washington State Bar Association, after reviewing the record made before the hearing panel, recommended that the respondent attorney be suspended for a period of 1 year. As the Bar Association points out in its brief, the hearing panel is composed of three members, only one of which is a member of the disciplinary board. The board, on the other hand, consists of nine members, including two laymen, and has the advantage of extensive experience in disciplinary matters.

By characterizing the respondent's conduct in innocuous language, the majority has considerably lightened its impact. I believe the Bar Association's characterization is more appropriate. That body said:

Mr. Caplinger has violated his Oath of Attorney and the Code of Professional Responsibility by allowing his own interests in the financial affairs of his client to interfere with the proper conduct of his duties as an attorney. He has not provided his client with an accounting. He misled a court, a fellow attorney, a mortgage company

and his own client. He mixed personal and client's funds. He placed a mortgage upon his client's property without advising them he was doing so. He failed to protect his clients' interest by not documenting the understanding concerning the nature of the security interest and by allowing deeds which purported to convey an absolute interest to be filed.

All of this constitutes substantial conduct prejudicial to the administration of justice and contrary to Mr. Caplinger's Oath of Attorney. Such conduct merits a one year suspension.

The respondent's negligence in failing to properly document his business dealings with his client placed that client in a position where she would have been unable to prove her interest in the property held in the respondent's name. Had he died, his estate would have been the beneficiary and his client the loser. The mere fact that she had suffered no loss—or no provable loss—at the time these proceedings arose is not conclusive of the damage which might naturally flow from such negligent and deceptive documentation. Furthermore, the respondent's failure to keep accurate accounts of the rents received makes it impossible to determine whether the client has received all that she is entitled to from that source. While the respondent has offered a deed to the property, he has not offered an accounting.

The inference that the respondent allowed his personal interest in the property to sway his judgment in the matter of notifying the court, his mortgagee, and his client of conflicting claims is difficult to avoid. This was the inference drawn by the board but evidently rejected by the majority.

By his own conduct in these matters, the respondent violated his oath as an attorney and the Code of Professional Responsibility by engaging in conduct prejudicial to the administration of justice, (CPR) DR 1–102(A)(5), by failing to preserve the identity of his client's funds, (CPR) DR 9–102(B)(2), (3) and (4), and by failing to limit his business relations with a client, (CPR) DR 5–104(A).

The fact that others may have been treated more leniently than the circumstances warranted should not

deter the court from imposing a discipline designed to accomplish the objectives of this proceeding.

The court has repeatedly stated that

the basic and underlying purpose of all attorney disciplinary action—be it censure, reprimand, suspension, or disbarment—is for the protection of the public and to preserve confidence in the legal profession as well as the judicial system.

*In re Smith,* 83 Wn.2d 659, 663, 521 P.2d 212 (1974).

Conduct such as that of the respondent can result only in the undermining of public confidence in the profession and the judicial system, and the exposure of clients to abuse of the confidence which they repose in their attorneys. However, since this is the respondent's first offense, and since no fraud was found, I agree that a suspension of 1 year is a discipline more harsh than the circumstances require. I would suspend the respondent attorney for a period of 90 days.

HAMILTON and STAFFORD, JJ., concur with ROSELLINI, J.