[No. C.D. 6269.    En Banc.    June 6, 1975.]

*In the Matter of the Disciplinary Proceeding Against* EGIL KROGH, JR., *an Attorney at Law.*

*Michael E. Jacobsen,* for Bar Association.

*Egil Krogh, Jr.,* pro se, and *William L. Dwyer,* for respondent.

ROSELLINI, J.—Egil Krogh, Jr., was admitted by this court to the practice of law in the state of Washington on September 20, 1968. On February 4, 1974, he was suspended as a result of his having been convicted of a felony, and on

February 19, 1974, a formal complaint was filed by the president of the Washington State Bar Association containing a single item.

It alleged that on November 30, 1973, an information was filed in the United States District Court for the District of Columbia (Criminal No. 857-73) charging the respondent with a violation of 18 U.S.C. § 241 (conspiracy against rights of citizens), a felony. According to the allegations, the respondent attorney thereafter pleaded guilty to the information and on January 25, 1974, a judgment and commitment order was entered, finding the respondent attorney guilty of the crime charged in the information. The respondent was sentenced to imprisonment for a period of 2 to 6 years, provided, however, that he would be committed for a period of 6 months, with the execution of the remainder of the sentence suspended and the respondent attorney placed on unsupervised probation for a period of 2 years.

The complaint charged that the acts and omissions of the respondent constituted violations of rule 1.1(a) and rule 1.1(c) of the Rules for Discipline for Attorneys.

DRA 1.1(a) provides that an attorney may be censured, reprimanded, suspended, or disbarred for the commission of any act involving moral turpitude, dishonesty or corruption, whether it be committed in the course of his relations as an attorney, or otherwise, and whether it constitutes a felony or misdemeanor. It provides that his conviction shall be conclusive evidence, at the disciplinary hearing, of his guilt of the crime described in the indictment or information and of his violation of the statute upon which it is based.

The rule further provides for a disciplinary hearing, according to the provisions of DRA 3.2, to determine whether moral turpitude was in fact an element of the crime committed by the attorney, and the disciplinary action recommended to result therefrom. The findings, conclusions and recommendations of the hearing panel are subject to adoption, modification or reversal by the disciplinary board,

upon its review of the record. If suspension or disbarment is recommended, the matter must be transmitted to the Supreme Court for final decision. DRA 5.6(h).

Rule 1.1(c) makes violation of an attorney's oath or duties grounds for disbarment.

It was also alleged that the respondent's conduct constituted a violation of the Code of Professional Responsibility, DR 1-102 (misconduct), providing in pertinent part that "(A) A lawyer shall not: . . . [e]ngage in illegal conduct involving moral turpitude." Later the complaint was amended to charge in addition a violation of (CPR) DR 1-102(A)(5), which provides, in part, that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice."

The information referred to in the complaint charged that while the respondent was an officer and employee of the United States Government, first as Deputy Assistant for Domestic Affairs to the President of the United States and later as Undersecretary of Transportation, and acting in his official capacity, in conjunction with others who were officials and employees of the United States Government, the defendant unlawfully, willfully and knowingly did combine, conspire, confederate and agree with his coconspirators to injure, oppress, threaten and intimidate Dr. Lewis J. Fielding, a citizen of the United States, in the free exercise and enjoyment of a right and privilege secured to him by the Constitution and laws of the United States, and to conceal such activities. It further charged that the coconspirators did, without legal process, probable cause, search warrant or other lawful authority, enter the offices of Dr. Fielding in Los Angeles County, California, with the intent to search for, examine and photograph documents and records containing confidential information concerning Daniel Ellsberg, and thereby injure, oppress, threaten and intimidate Dr. Fielding in the free exercise and enjoyment of the right and privilege secured to him by the fourth amendment to the Constitution of the United States, to be secure

in his person, house, papers and effects against unreasonable searches and seizures. The information alleged that the actual entry was made by coconspirators with the knowledge, consent, approval and assistance of the respondent. Various overt acts were alleged. To all of these allegations, the respondent had pleaded guilty.

In response to the filing of the complaint by the president of the bar association, a hearing panel was convened. The respondent, represented by counsel, appeared before it and explained that his admitted participation in the conspiracy came about in the following manner:

In 1968, when the respondent graduated from law school, he went to work for the firm of Hullin, Ehrlichman, Roberts and Hodge in Seattle. He practiced there about 3 months and was offered a job at the White House in Washington, D.C., which he accepted. He spent 4½ years in Washington. Upon returning from a trip to Vietnam in 1971 he was asked to be one of the directors of a White House "special intelligence unit," which became known as the "plumbers." The respondent was told that the President wanted him to undertake an assignment in connection with the unauthorized disclosure of the Pentagon Papers. He was told that the President wanted him to pursue the investigation with utmost zeal and he was instructed to read the first chapter of the President's book "My Six Crises," dealing with his investigation and pursuit of Alger Hiss. The respondent understood that his work was to be kept secret and that he was to apply the maximum effort and utilize whatever means the government had at its disposal to terminate any leaks in what the President termed "national security" information.

The respondent acted in accordance with his instructions.

It was suggested to him that it would be well to obtain a psychiatric profile of Daniel Ellsberg. Such a profile was prepared by the Central Intelligence Agency, but this profile was deemed unsatisfactory, since it did not show Ellsberg to be an untrustworthy person.

The respondent and his codirector adopted a plan suggested by E. Howard Hunt, who was also a member of the investigative unit, to break into the office of Ellsberg's psychiatrist and photograph whatever materials could be found in the files regarding Dr. Ellsberg. The respondent was told that both the CIA and the FBI had engaged in similar clandestine activities, the one abroad and the other at home, prior to 1966.[1] Insofar as his testimony revealed, he voiced no objection to the legality of the break-in, although he understood the FBI would ordinarily have been the proper agency to conduct domestic investigations, whether legal or illegal. The FBI was not asked to conduct this clandestine investigation, according to the respondent, because it was feared that it would give the director a position of advantage over the White House.

The respondent received assurance from Hunt and G. Gordon Liddy that the persons they would employ to conduct the entry into Dr. Fielding's office would effect the procedure in such a manner as to leave no evidence that a break-in had occurred. However, after the deed was perpetrated, he was shown pictures of the interior of Dr. Fielding's office which revealed that it had been left in great disorder.[2] Respondent was much distressed by this fact, not,

---

[1] A member of the hearing panel asked the respondent whether he had been aware that such FBI activities were discontinued after 1966 because of Supreme Court rulings concerning their legality. He said that he had not been aware of the reason the activities had been abandoned and had not made any inquiry about it.

[2] "I anticipated a surreptitious entry. That was the sort of specific extension of covert operation. A surreptitious entry is one which is not detectible. What was done was a very messy, smashed up office. I will say the mistake that I felt at the time was not the fundamental issue of legality or illegality, lawfulness or unlawfulness, but merely to the way that this was carried out. That is a distinction I should have made clear when I was responding to questions earlier. I was very concerned about the mess that had been made, the destroyed office, because the psychiatrist had been interviewed five weeks prior by the FBI and he had not responded to questions, and the closeness between a smashed up office and that refusal to answer questions to me was a terrible mistake, and that made it clear it wasn't covert; but the mistake was in the confines of the way the operation was carried out, not to its basic premise." Tr. 152.

it appears, because of concern for Dr. Fielding's property but rather because of the fear that an investigation of the burglary might lead to a discovery of the identity of the perpetrators.

Shortly after this incident the special investigative unit ceased to function as such. The respondent testified that he had never participated in any other enterprise of this nature.

When the break-in of the Democratic National Headquarters at the Watergate Hotel became a subject of investigation by the Senate, inquiries made by the investigating committee revealed the existence of the special investigative unit and the clandestine nature of its mission, as well as the identities of its directors and at least some of its members. It was during this investigation that Daniel Ellsberg was being tried for alleged violations of federal law in disclosing the Pentagon Papers. In April 1973 the respondent was informed that a memorandum describing the break-in in California had been presented to the President and that the President "as a matter of principle" decided that this memorandum should go to the judge presiding in the Ellsberg case. The memorandum was turned over to the defense, and public disclosure immediately followed. Judge Byrne, the judge conducting the Ellsberg case, had asked for affidavits from all individuals who had any knowledge about the break-in.

After some days of deliberation and after discussing his problem with Elliott Richardson, the Attorney-General designate, and with John Ehrlichman, Assistant to the President for Domestic Affairs, the respondent concluded that he should disclose what he knew about the break-in by way of affidavit. He asked Ehrlichman to ask the President to relieve him from all "executive privilege" and "national security" requirements. Ehrlichman told him on May 2 that the President had relieved him of the executive privilege restriction to the extent that he could describe the meeting

with the President at which he had asked for the investigation of Ellsberg.

The respondent immediately took a leave of absence from the Department of Transportation and began to compose his affidavit. Two days later before it was completed, he was told that the President's restrictions had been reinstated; nevertheless, he completed his affidavit and submitted it to Judge Byrne and to the Watergate prosecutor. A few days later he resigned from his position as Undersecretary of Transportation.

The respondent was indicted upon several counts including one of making false declarations in September of 1973. He at first and for a period of time asserted a defense of national security. Later, becoming convinced that this was not a valid defense, his attorney effected an agreement with the prosecution whereby he pleaded guilty to the conspiracy charge and the other charges were dismissed. In describing the change of attitude which induced him to change his plea to guilty, the respondent said:

> In November I took a trip with my wife and children to Williamsburg for the Thanksgiving vacation. As I said, I had been vigorously defending up until just a few days before we left, both in motions to the court in Washington, D.C. and motions to the court in California and in all public statements to that time. However, in Williamsburg I can't quite explain what took place for me. I suppose it was a combination of things. First, I had a chance to sit back and sort of look at where I was. I was under indictment in both California and Washington and yet I was a person that was at large, free to travel, free to associate with whomever I wished. I could say what I wanted to and if I said it to certain individuals it would get reported. I could attend any church of my choice. There were a number of things I was enjoying as a defendant, potential defendant in a criminal trial and yet here I was defending conduct when I was a government servant which had stripped another individual of his Fourth Amendment rights to be secure from an illegal search, and I suppose it was that I felt that if I had continued to defend that, I would in a sense be attacking the very rights which

I was enjoying at that time as a potential defendant. And it then became very clear that the only way that I could really affirm my own belief in what at that time had been evolving—it hadn't been something that came as a blaze of light; it came over a period of months—the only way I could affirm what I believed the government to be resting upon, which was the rule of law, would be to enter a plea of guilty to the substantive charge of conspiracy to deprive civil rights, and that weekend, as I say, it all came together, and four days later I entered a plea before Judge Gesell.

Describing his state of mind after making the decision, he said:

I felt very free in thought and I have never had a moment's doubt that it was the right decision. My only regret was that it took so long to come to it, but there was a combination of being very much afraid of the consequences, both jail and prison, loss of occupation, perhaps deprivation of profession, what have you, and a number of consequences which were almost—were staring me in the face. There were a number of things I had to face. *Once I was able to come to grips with the underlying violation that I had been involved in, no matter what the motivations had been, no matter how sincere they had been, no matter how honestly we proceeded, it still didn't justify it, and I feel that way today.*

(Italics ours.)

Questions by a panel member elicited the following responses during the course of the respondent's testimony:

Q. Is it fair to summarize by saying that in order to get the medical records of Dr. Ellsberg you basically had three opportunities or three ways of getting it. One, you had to get a release from the patient—and I presume Dr. Ellsberg would not have been willing to sign a waiver or release—or you had to break in to copy the records or bribe somebody who was a custodian of the records. A. Or you could get a court order. Q. Or you could get a court order? A. On the grounds there was probably cause to suspect that some crime had been committed. Q. You did not have the probable cause in this case to get a court order? A. No. Q. You were limited to the

other three alternatives, were you not? A. Yes sir. Q. So, when the covert operation was discussed it was fairly clear to everybody it was an illegal act you were about to perform? A. In a sense that a break-in by people, say, citizens, is illegal, you would have to say yes. I do say yes to that, but that government itself had been engaged in these types of activities for reasons which seemed to transcend normal reasons for entry operations. *In this case we felt this operation was essential to acquire and that there was a justification for the act in the President's inherent power to investigate and we felt very much an extension of his—I would say of his power or his authority at this point, erroneously I might add.*

(Italics ours.)

The respondent admitted that he had made no investigation to determine the legality of either CIA, FBI or Presidential "covert operations." He also admitted that the motivation for secrecy was the knowledge that such operations constituted a "rough-tough" way to handle the "national security" issue, and the feeling that something of that nature should not become publicly known "because government wouldn't—shouldn't have it known and they hadn't in the past." The respondent said:

I think there was a very strong sense that time that the authority under which we were operating and the circumstances as they were presented to us would justify practically whatever was done at that point, that the interest of this country necessitated it.

The respondent admitted upon questioning that, when interviewed by the special prosecutor in 1972, he had not told the truth about the special investigative unit, the participation of Messrs. Hunt and Liddy, and its operations. He stated that he continued to maintain silence for a period of more than 2 years after the break-in upon the justification that the "national security" was involved. Finally, after the Watergate indictments were underway, his codirector Young had obtained immunity in exchange for his testimony, and others were engaging in plea bargaining, he came to realize that the term "national security" might have

been used in a sense much broader than its legitimate meaning and that his activities as White House investigator did not fall within it.

The respondent's statements evaluating his own conduct showed that he did eventually, after indictment, realize that he had made a serious mistake in letting expediency be his guide in carrying out the purposes of the special investigative unit. He expressed sincere regret and earnest hope that he would not in the future be guided by such considerations. He indicated that he had been blinded, perhaps, by the power of the Presidency or what he conceived to be its power. A number of men who submitted letters attesting to his good character expressed the concern that they in the same circumstances might have behaved in much the same manner.

Before the panel and before this court, to his credit, the respondent has not taken the position that he should be exonerated because of the circumstances under which his crime was committed or exempted from disciplinary action because of his subsequent remorse. He has asked, however, that the disciplinary action taken be something less than disbarment. The hearing panel recommended a suspension of 9 months' duration. Upon reviewing the record the disciplinary board recommended to this court that the respondent be disbarred.

Both the hearing panel and the disciplinary board found that moral turpitude was an element of the crime of which respondent was convicted. The panel found that he has a spotless record except for the incident involved in these proceedings; that he is outstanding in character and ability; that his reputation is beyond reproach; that he acted, although mistakenly, out of a misguided loyalty to the President of the United States; that the event was an isolated one, and that in all probability there would be no repetition of any such error on his part. The panel further found that the respondent had accepted responsibility and had made amends to the best of his ability; that he testified fully and

candidly and that his attitude in the proceeding was excellent. The panel concluded that in this case which it found to be distinguishable from all other cases, the respondent apparently followed the order of a "somewhat distraught President of the United States" under the guise of national security to stop by all means further security leaks. The panel further concluded that the evidence showed and it was admitted by the respondent that his conscience at that time and for some time thereafter was not alert enough to refuse participation in the unlawful activities involving Dr. Fielding and Daniel Ellsberg and to recognize that national security was not a lawful justification for such an operation.

In recommending that the respondent be disbarred, the disciplinary board points out that in the three cases in which this court has been called upon to discipline attorneys convicted of conspiracy violations, the punishment imposed has been disbarment. These are the cases of *In re Wells*, 121 Wash. 68, 208 P. 25 (1922) (conspiracy to oppose and delay by force the authority of the President in executing a resolution of Congress declaring war against Germany); *In re Finch*, 156 Wash. 609, 287 P. 677 (1930) (conspiracy to violate the several prohibition laws); and *In re Barnett*, 35 Wn.2d 191, 211 P.2d 714 (1949) (conspiracy to barter and exchange narcotics).

The disciplinary board also cites a recent California case, *Toll v. State Bar*, 12 Cal. 3d 824, 831, 117 Cal. Rptr. 427, 432, 528 P.2d 35 (1974), wherein the court said:

> Although the committee's as opposed to the Board's *factual findings* are entitled to the greater weight, it is the Board's recommendation in matters of the *discipline* to be imposed which is to be accorded the greater weight. The final word as to discipline, of course, rests with this court . . .

We recently summarized the guiding principles to be considered in disciplinary actions in the case of *In re Smith*, 83 Wn.2d 659, 663, 521 P.2d 212 (1974). There we said:

We have frequently stated that serious consideration will be given by this court to the recommendations of the Disciplinary Board in disciplinary matters. The ultimate responsibility for determining the measure of discipline, nevertheless, rests with and upon this court. *In re Espedal*, 82 Wn.2d 834, 514 P.2d 518 (1973); *In re Kennedy*, 80 Wn.2d 222, 492 P.2d 1364 (1972). We have likewise reiterated the proposition that the basic and underlying purpose of all attorney disciplinary action—be it censure, reprimand, suspension, or disbarment—is for the protection of the public and to preserve confidence in the legal profession as well as the judicial system. *In re Greenlee*, 82 Wn.2d 390, 510 P.2d 1120 (1973); *In re Hawkins*, 81 Wn.2d 504, 503 P.2d 95 (1972); *In re Steinberg*, 44 Wn.2d 707, 269 P.2d 970 (1954).

In making the ultimate determination as to the measure of disciplinary action, we give consideration to: (a) the seriousness and circumstances of the offense, (b) avoidance of repetition, (c) deterrent effect upon others, (d) maintenance of respect for the honor and dignity of the legal profession, and (e) assurance that those who seek legal services will be insulated from unprofessional conduct. *In re Espedal, supra; In re Greenlee, supra; In re Kennedy, supra; In re Pennington*, 73 Wn.2d 601, 440 P.2d 175 (1968).

In *In re Finch, supra*, this court said that when one conspires with others to violate and set at naught the laws of the United States, such an act violates the commonly accepted standard of good morals, honesty and justice, and necessarily involves moral turpitude. Here, the conspiracy in which the respondent was involved was undertaken in flagrant disregard not only of the laws of the United States but of the rights of the citizens guaranteed by the fundamental law itself—the Constitution of the United States.

The Supreme Court of the United States has expressed quite eloquently the gravity of such an offense when it is committed by an attorney at law, an officer of the court. In *Ex parte Wall*, 107 U.S. 265, 27 L. Ed. 552, 2 S. Ct. 569 (1882), the court upheld the summary action of a district judge of the United States District Court for the Southern

District of Florida, in disbarring an attorney who had participated and in fact acted as a leader in the lynching of a prisoner in the county jail. The victim was hung within sight of the courthouse.

Noting the circumstances under which the name of an attorney would be struck from the roll, the court said that if regularly convicted of a felony an attorney would be struck off the roll as of course, whatever the felony may be, because he is rendered infamous. It found that under the circumstances of that case, although the attorney was guilty of an infamous crime, there was, because of popular feeling, grave doubt that he would be brought to trial. It concluded that under such circumstances it was not necessary for the judge to await the attorney's trial and conviction before striking his name from the roll. Upon the question whether the acts of the attorney were of a kind which would justify disbarment, the court said, at pages 273-74:

> Now, what is the offence with which the petitioner stands charged? It is not a mere crime against the law; it is much more than that. It is the prostration of all law and government; a defiance of the laws; a resort to the methods of vengeance of those who recognize no law, no society, no government. Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, to trample them under foot, and to ignore the very bands of society, argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve.

The rule stated by the court in *Ex parte Wall*, *supra*, that the name of an attorney is stricken from the rolls as a matter of course if he is convicted of a felony, was the prevailing rule at the time that case was decided. (*See* E. Weeks, *Attorneys at Law* 166 (2d ed. C. Boone 1892); *see also* E. Thornton on *Attorneys at Law* §§ 856-58 (1914).)

██ That rule still governs the disposition of such disciplinary proceedings in a number of jurisdictions. *See* 7 C.J.S. *Attorney & Client* § 21 (1937), 81 A.L.R. 1196-99 (1932). However, under our disciplinary rules, some flexibility is permitted, and the court retains its discretionary power to determine whether, on the facts of the particular case, the attorney should be disbarred. This approach appears to be in harmony with the views of Mr. Drinker, who was chairman of the Standing Committee on Professional Ethics and Grievances of the American Bar Association at the time he wrote his book entitled Legal Ethics (Columbia University Press) (1953).

However, counsel has called to our attention no case in which we have found that an attorney convicted of a felony should not be disbarred. Among the cases in which this court has, in recent years, ordered the disbarment of felons are: *In re Anderson*, 73 Wn.2d 587, 439 P.2d 981 (1968) (grand larceny); *In re Hett*, 70 Wn.2d 435, 423 P.2d 629 (1967) (formation of a fictitious corporation for unlawful purposes to meet the entry requirements of a foreign country, and aiding in falsification of a passport for his client); *In re Wallis*, 63 Wn.2d 833, 389 P.2d 421 (1964) (grand larceny); *In re Dalton*, 60 Wn.2d 726, 375 P.2d 258 (1962) (grand larceny); *In re Timothy*, 58 Wn.2d 153, 361 P.2d 642 (1961) (grand larceny); *In re Seijas*, 52 Wn.2d 1, 318 P.2d 961 (1957) (filing fraudulent income tax returns); *In re Dillard*, 48 Wn.2d 376, 293 P.2d 761 (1956) (misappropriation of funds), and *In re Bixby*, 31 Wn.2d 620, 198 P.2d 672 (1948) (subornation of perjury—we remarked in that case that we knew of no case in which the court had refused to disbar an attorney who had been convicted of a crime and cited numerous cases in which this discipline had been imposed).

The question before us then, is: Should the respondent, who has been convicted of a felony involving moral turpitude, be disbarred?

We think that what was said in *Ex parte Wall, supra,* is particularly appropriate and applicable in the case of the respondent. His testimony reveals that when it was suggested that he violate not only the laws but the constitutional rights of his fellow citizens, he accepted the proposition without any misgivings as to its legality, accepting as a tenable proposition the notion that whatever was ordered by his superiors should be done. Such an attitude on the part of an attorney, particularly one who has accepted a position of responsibility in the office of the President of the United States, manifests at once a fundamental unfitness to serve as an officer of the courts.

Nevertheless, the respondent's attorney suggests that the findings of the hearing panel establish beyond dispute his fitness to continue in the practice of law.

The panel's findings were, of course, based upon the evidence offered before it. The bar association confined its case to the presentation of evidence of the felony conviction and to cross-examination of witnesses, including the respondent. Aside from the respondent's testimony, most of the evidence consisted of character witness testimony. Many letters were written to the panel praising the respondent's character and his humanitarian endeavors. These accounts of such activities showed the respondent to be a warm and compassionate human being. Few of the witnesses seemed to consider the respondent's crime a serious one or to contemplate that it might indicate the presence in his character of qualities inappropriate in a member of the bar.

The record supports the panel's findings to the extent that those who testified in his behalf asserted that his reputation is very good indeed. However, we cannot lose sight of the fact that the vast majority of the people do not have the advantage of this intimate knowledge of the respondent and his character. They know only his crime and the role that he played as director of the White House "plumbers," an organization the full extent of whose surreptitious activities has not yet been revealed. We cannot rightly assume

that with them, his reputation is "beyond reproach." We are not prepared to agree with the panel that the respondent's reputation was established beyond cavil by the testimony of the witnesses who appeared in his behalf.[3]

Nor do we agree that there was sufficient evidence to show that "in all probability there will be no repetition of any such error on his part." There was no evidence to support this finding, unless it was the respondent's recognition of his mistake (as he termed it) and his evident remorse. We would be more inclined to share this view of the panel if his recognition and remorse had not come so late —only, it seems, after it became evident that in spite of all the efforts of the administration to conceal them, the investigative activities conducted in and by the White House were going to be exposed.

The respondent testified that he was so overawed by the prestige and power of the Presidency that his conscience was lulled to rest during the time he served as director of the special investigative unit. He assumed that whatever had been done in the past by the CIA and the FBI, he could also do with impunity. In effect, he acknowledged that he considered the President and his staff, including himself, above the law. At the same time he was very concerned that the investigative activities be kept secret. In fact, his testimony reveals that he came to consider the Fielding break-in a mistake not because it was unlawful but because it was not done in such a way as to leave no evidence that it had occurred.

We find it difficult to believe that the respondent was not aware that the activities in which he was engaging were at least questionable under the law. Certainly they were extraordinary enough that the average law school graduate, recently admitted to the bar—even one who had practiced only a few months as had the respondent—would be ex-

---

[3] *See The Bar and Watergate: Conversation With Chesterfield Smith* (President, American Bar Ass'n), Hastings Constitutional L.Q. 31-38 (1974); S. Hertzberg, *Watergate: Has the Image of the Lawyer Been Diminished?* 79 Com. L.J. 73-74, 81 (1974).

pected to do some investigative research to determine their legality. Apparently it did not occur to the respondent to look at the constitution, the statutes, or the case law to ascertain whether his project was unlawful. Had he advised a client to engage in such an activity, he would surely have been aware that he was violating his oath as an attorney if he did not make certain that the conduct suggested was permitted by law. *See* (CPR) DR 7-102.

The respondent's able counsel, whose diligence in his client's behalf is manifested in his brief and argument before this court, has revealed no authority which would justify the respondent's actions and we feel safe in stating that had the respondent looked for such authority before he acted, he would have ascertained at once that the contemplated venture was unlawful.

If every citizen is presumed to know the law, even though his opportunities to acquire such knowledge are extremely limited, how much greater is the presumption in the case of the attorney, who has been found to have the knowledge and the skill necessary to enable him to detect the presence of a legal problem and to find the answer. The respondent's conduct cannot be excused on the ground of ignorance. Here, not only did the respondent fail to question the propriety of his own acts at the time they were committed; for 2 years thereafter his mind and conscience remained at rest. His interest in the quality of his acts was not aroused until it appeared that his conduct could no longer be kept secret.

Should the respondent's participation in the illegal entry be excused—because he was overawed by the power and prestige of his superiors and his perception and analytical powers thereby lulled to rest? Again, were he a layman, much could be said for a policy of tolerance of such human frailty—a frailty evidently so common that a number of the respondent's witnesses, regrettably including lawyers, declared unabashedly that had they been in his position they would probably have acted as he did.

We cannot accept the assumption that attorneys, who have been schooled in the Constitution of the United States and of the State and who have dedicated themselves to the concept of the rule of law, can ordinarily be expected to abandon the principles which they have sworn to uphold, when asked to do so by a person who holds a constitutional office. Rather than being overawed by the authority of one who holds such an office, including the highest office, the attorney who is employed by such an officer should be the most keenly aware of the constitution and all of its provisions, the most alert to discourage the abuse of power. In such a position those powers of discernment and reason, which he holds himself out as possessing, perform their most important function. If, when given a position of power himself, he forgets his oath to uphold the constitution and laws of the land and instead flaunts the constitutional rights of other citizens and holds himself above the law, can we say to the public that a person so weak in his dedication to constitutional principles is qualified to practice law?

It is maintained that the punishment which has been suffered by the respondent is sufficient to guarantee that he will not again forget his oath. We do not find this argument convincing, for we have searched the testimony of the respondent in vain, seeking to find some indication that he truly understands the nature and seriousness of his default. All we can gather from his testimony is that he still regards his offense as merely a mistake. He recognizes that the invasion of Dr. Fielding's office was offensive to the psychiatrist and that the right to be free from unlawful search and seizure is a valuable right. But when his testimony is read as a whole, the conclusion is inescapable that he still believes that he acted with proper motives, with sincerity and with honesty—and that he was simply misguided. If, as the panel said, he displayed complete candor in his testimony, it must be concluded that he does not comprehend his duty as an attorney—the duty to analyze,

to inquire, to investigate and to examine the law—and above all, the duty to uphold the constitution not only when it is easy to do so but also, especially, when it is easier to ignore it; and how gravely he breached that duty when he ordered the commission of a felony involving a violation of the constitutional rights of a fellow citizen.

*In re Morrison*, 45 S.D. 123, 186 N.W. 556 (1922), was a case in which an attorney, disbarred upon a showing that he had committed perjury, sought reinstatement. As in this case, many witnesses appeared in his behalf, asserting his good character and urging that his petition be granted. Of them the court said, at page 130:

> Many urge that the *punishment* he has suffered will deter him from future wrongdoing, forgetting that it is not fear as to the consequences of wrongdoing that qualifies one for admission to the bar, but rather an innate desire and intent to follow the right course.

It is that desire and intent, so fundamental in the attitude of the principled attorney, which is shown to have been so little evident in the case of the respondent, as well as other attorneys whom the President of the United States gathered about him and who, in their zeal to serve their leader, forgot that their highest duty is to the law.

That the reputation and honor of the bar have suffered severe damage as a result is now a matter of common knowledge. We find it difficult to believe that the respondent was not aware, when he authorized the burglary of Dr. Fielding's office, that if his conduct became known, it would reflect discredit upon his profession.

The fact that we find the respondent unfit to continue in the practice of law does not mean that we ignore his fine qualities of personality, temperament and mind, his concern for his fellow human beings and his many generous and thoughtful acts. A person may be of the highest character and yet not be a proper person to practice in the profession of law. The reason for this, of course, is that the lawyer dedicates himself to a system of values which im-

poses upon him the duty of knowing, understanding and supporting the constitution and laws of the land. Those laws may contain many provisions which are offensive to him, but he accepts the premise that change must come through the orderly processes provided in the constitution and the statutes.

If he does not accept and dedicate himself to this commitment and rather places himself or his masters or his convictions above the law and flaunts it in the excess of his zeal, he does a great disservice to that which he has sworn to serve—the constitution and the rule of law.

The case of *In re Brooks*, 57 Wn.2d 66, 355 P.2d 840 (1960), provides an example of the difficult judgments which the court must sometimes make in determining that a person of the greatest ethical sensitivity and humanitarian commitment is not qualified to practice law. The petitioner in that case, subject to the draft, had been granted noncombatant status as a conscientious objector, but had been ordered to report to a public service camp to perform other work of national importance not involving combat duties. Such substitute services being also objectionable, according to his principles, he refused to report. As a consequence, he was indicted, tried, convicted and sentenced under section 311 of the Appendix to Title 50 U.S.C.A., making such refusal a felony. He served 22 months of a 3-year sentence in a federal penitentiary. Some 15 years after World War II had ended, he applied for admission to the bar of this state. The Board of Governors found him otherwise qualified, but concluded that he was not a person of good moral character because he had committed acts which were "unjustifiably defiant of the laws of the United States." A majority of this court approved the recommendation of the Board of Governors that his petition be denied. The majority opinion states, at page 69:

A loyal and discerning citizen is aware of his great heritage of liberty and acknowledges his duty to do his share in preserving it. Without a sense of duty, the applicant

does not measure up to the standard of citizenship rightly expected of an attorney at law.

It will be seen that the offense of the petitioner in that case did not nearly approach in gravity the offense of the respondent here. He was not in a position to exercise power over his fellow citizens, and he did not use his power to violate a constitutional right of one of them, as did the respondent. His conduct was not surreptitious but was open and candid. His conduct was motivated by principle, a principle which he placed above the duty to serve his country. The conduct of the respondent, on the other hand, appears upon fair appraisal to have been motivated by expediency. The petitioner in *Brooks* was not indifferent to the law but rather was gravely aware of and concerned with it. Finding that it imposed upon him a duty which he could not, according to the dictates of his own conscience, perform, he disobeyed the law and accepted the consequences. His character, if judged by divine law, was undoubtedly exemplary; but judged by the law of the land, it contained a flaw so intimately related to the concept of the duty of an attorney that he was found unfit to practice law.

The preamble to the Code of Professional Responsibility states:

> The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and his capacity through reason for enlightened self-government. Law so grounded makes justice possible, for only through such law does the dignity of the individual attain respect and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.

Judge Gerhard A. Gesell, before whom the respondent pleaded guilty to the charge upon which this proceeding is based, had these principles in mind when he said, in pronouncing sentence:

> A wholly, improper, illegal task was assigned to you by higher authorities and you carried it out because of the

combination of loyalty and I believe a degree of vanity, thereby compromising your obligations as a lawyer and as a public servant.

. . .

. . . Justice Brandeis once said: If the Government becomes a law breaker, it breeds contempt for the law. It invites every man to become a law unto himself. It invites anarchy. I think this is true. Because you are a lawyer, because you held high responsibility when the offense occurred, because you have had many of the advantages which our society offers, because you committed perjury when properly questioned by law enforcement officials, and thus concealed your breach of the public trust, any punishment short of jail would, in the court's view, be inadequate.

For the reasons set forth herein, we must conclude that the respondent, in spite of his many commendable qualities and achievements, has shown himself to be unfit to practice law. His attorney draws our attention to the principle, set forth in *In re Little*, 40 Wn.2d 421, 244 P.2d 255 (1952), that, in a disciplinary proceeding, all doubts should be resolved in favor of the attorney. However, if the statement is read in context, it will be seen that it refers to doubts concerning the commission of the acts charged against the attorney. Here, no such doubt exists. The only question concerns the gravity of the offense and what it indicates about the attorney's fitness to practice law, as measured by the criteria set forth in *In re Smith*, 83 Wn.2d 659, 521 P.2d 212 (1974). Applying those criteria to the circumstances of this case, we find that (a) the crime is one of great seriousness, performed as it was by an attorney in a position of public responsibility and invading as it did the fundamental rights of citizens, (b) it has not been demonstrated that there is no danger of repetition if the respondent is again placed in circumstances where such conduct is solicited or encouraged (we acknowledge that such a contingency is indeed difficult of proof and it is not the controlling consideration here), (c) there is a manifest need for discipline sufficiently severe to deter others, since it is apparent

that many attorneys have found it relatively easy to forget their obligations, under the intoxication of governmental power, (d) the ultimate discipline is required in a case of this kind, for the reasons heretofore stated, if respect for the honor and dignity of the profession is to be maintained. With all of these considerations indicating the correctness of the recommendation of the Board of Governors, we need not inquire into the question whether the need to insulate clients from unprofessional conduct likewise compels this conclusion and will assume that it does not.

The recommendation of the disciplinary board is approved, and the respondent's name shall be stricken from the roll of attorneys in this state.

STAFFORD, C.J., and HUNTER, HAMILTON, WRIGHT, and BRACHTENBACH, JJ., concur.

FINLEY, J. (concurring specially in the majority)—I am not too concerned by some of the rather forceful language of the dissent.

However, I am concerned by some of the context or content and some of the implications of the dissent, and feel a need to respond. In this regard, it is particularly troublesome that I seem to sense in the dissent an aura of critical disbelief and disquietude with the fact that individual human thought processes—given sufficient intellectual effort, ability and integrity—fail to or cannot produce absolute agreement and an assurance of infallibility in the resolution and disposition of appellate cases including disciplinary matters. To the contrary, experience demonstrates to me convincingly that much of the time a reasonable and rational basis exists for disagreement rather than for exactitude, uniformity, and absolute agreement in the resolution and disposition of appeals by a multijudge appellate court. Finally, the dissent, in essence, seems to me to say that no one with reasonable intelligence and legal training, and with a sense of fairness and social, judicial, and professional responsibility could agree with the majority opinion.

To the contrary, I must and do disagree with the possibly subliminal overtones and with the basic thrust and the conclusions of the dissent.

Now, first, this is not the case of a young boy scout who has violated significant moral principles, perhaps of the scout code, or the scout oath, and who has told all, and expressed great personal regrets to an understanding and forgiving scoutmaster. As stated in the dissent, the national consternation and confusion, trauma, and disgrace of Watergate and its many facets are all still with us, and are likely to be for some time.

Second, Mr. Krogh was not merely a lowly lackey at the bottom of the totem pole in the most awesomely powerful governmental office in today's world. He was—at the top of the totem pole, one of the close and most intimate circle of personal advisors to the President of the United States. He certainly was not the chief architect of Watergate; however, he was certainly one of the principals of the so-called "plumbers" unit in *willfully, intentionally, and unlawfully* planning, implementing, and carrying out the burglary of the private office of an individual citizen of the state of California and of the United States. As the dissent points out, his actions involved in this disciplinary proceeding do not involve a lawyer-client relation. But it is difficult for me to see how this separates or immunizes him as to responsibility for considering and being guided and, yes, bound by traditional concerns of the legal profession for the protection of the constitutional, statutory, and other historical civil rights of individual citizens.

Third, the dissent's principal focus is upon the hearing panel's recommendation that Mr. Krogh be suspended from practice for 9 months and upon the numerous recommendations for leniency, emphasizing the unlikelihood of repetition or of future aberrational conduct by him. But, the dissent is strangely silent except for tangential reference to the fact that the disciplinary board *rejected the hearing panel's* recommendation *and, instead, recommended disbarment.*

Fourth, the dissent's reference to the unlikelihood of future aberrational conduct emphasizes only one of the possible reasons, among other considerations in a disciplinary matter, for the imposition of attorney discipline by the Supreme Court. This emphasis, in my opinion, assumes too much and is disproportionate. Considering what happened, how can anyone be so sure that under the same or similar circumstances, or perhaps ones of considerably less drama, pomp, and circumstance, Mr. Krogh would be a model of rectitude and exemplary professional conduct?

Fifth, the imposition of attorney discipline is probably one of the most unique and important functions of the state Supreme Court. It is not just a simple matter of applying sterile or objective legal concepts, other abstractions or even ancient or modern so-called precedential decisions. To begin with, no two cases of attorney discipline involve the same facts and seldom, if ever, identical or similar circumstances. The function, to some extent, is objective and abstract but also involves a delicate combination of personal opinion, discretion, and value judgment. My particular and personal combination of these several touchstones leads to a strong conviction in the credence and propriety of the result reached by the majority opinion: namely, the disbarment of Mr. Krogh. I choose this course of action involving an exercise of my individual, and partly collective, responsibility as a member of this court, without expectation of agreement or solace from anyone or any quarter. This is the way it is, and the way it should be in the making of judicial decisions.

Sixth, considering the sudden and as yet not-too-well explained or understandable full executive pardon granted to the chief architect of the many facets of the tragic Watergate fiasco, it could be somewhat tempting to shrug off official duty, professional, public, and social responsibility in this case. However, I am not about to sweep under the rug all considerations and responsibilities for formulating and articulating some basic value judgments as to Water-

gate activities and in particular the culpability of individu-als who participated in varying fashion and degree. I prefer the less permissive and more arduous course followed by Judge Gesell of the United States District Court for the District of Columbia who refused, in effect, to grant judicial clemency, denied probation, imposed sentence, and required Mr. Krogh to serve time for his connection with and participation in the California burglary of the office of Mr. Ellsberg's personal doctor.

For the reasons stated forthrightly, and also admittedly stated in somewhat strong language, particularly in response to the dissent, I find no alternative to formulating a delicate balance of the considerations pertinent to imposition of discipline other than to concur in the majority opinion.

STAFFORD, C.J., and WRIGHT and BRACHTENBACH, JJ., concur with FINLEY, J.

WRIGHT, J. (concurring)—I concur in the majority opinion and I have signed the same.

We have long been committed to the policy that conviction of a felony begets disbarment. An early case annunciating this principle was *In re Hopkins*, 54 Wash. 569, 103 P. 805 (1909), which was a case involving a conviction in a federal court. In a somewhat later case, *In re Barnett*, 35 Wn.2d 191, 211 P.2d 714 (1949) we said in part at page 191: "The attorney was convicted of an infamous crime as defined by Rem. Rev. Stat., § 5113 [P.P.C. § 519-17], and should no longer be permitted to practice law. [Citations omitted.]" Rem. Rev. Stat. 5113, now RCW 29.01.080, was mentioned. It contains a definition of the term "infamous crime," which definition is identical with the definition of "felony" contained in RCW 9.01.020.

A recent case on this subject is *In re Anderson*, 73 Wn.2d 587, 439 P.2d 981 (1968), in which conviction of a felony resulted in disbarment. No useful purpose would be served by again listing the vast number of cases ending in the

same result as a number of them are listed in the majority opinion.

Equal justice under law demands that we accord the same treatment to prominent members of the legal profession that is accorded to obscure practitioners. In fact, more harm is done—more blame attaches—when the misconduct is committed by a prominent attorney.

There are other considerations which must not be overlooked. Respondent was convicted only of a violation of 18 U.S.C. § 241, or conspiring against the rights of citizens. The acts charged and admitted, however, would, if committed in this state, constitute burglary in the second degree—a felony. RCW 9.19.020. *In re Burns*, 13 Wn.2d 199, 124 P.2d 550 (1942), involved a conviction in federal court for an act which would have been burglary under the laws of the state of Washington. Burns was disbarred.

Respondent also committed perjury, as was found by Judge Gerhard A. Gesell when sentencing. Perjury is likewise a felony under the laws of the state of Washington. RCW 9.72.

Lawyers are held to higher standards of moral conduct than are other citizens. Both the Washington State Bar Association and this court have long taken a strong stance on the matter of ethical standards for attorneys. The oath of attorneys contains an obligation to abide by the laws of the state and the nation. The preliminary statement to the Code of Professional Responsibility (CPR) states in part:

> The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. Within the framework of fair trial, the Disciplinary Rules should be *uniformly applied to all lawyers*, regardless of the nature of their professional activities.

(Italics mine.)

(CPR) Canon 1 reads: "A Lawyer Should Assist in Maintaining the Integrity and Competence of the Legal Profession." In support of Canon 1 is (CPR) DR 1-102, which in part states:

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(2) Circumvent a Disciplinary Rule through actions of another.

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

In this proceeding we have a respondent who seeks by various means to claim he did not know what he was doing was wrong. He claims to have been blinded by the prestige of the office of the President of the United States; he claims he thought he was justified by the needs of national security. The stark fact remains—regardless of the President, regardless of national security—he must have known *conspiracy* was wrong, he must have known *burglary* was wrong, and he must have known *perjury* was wrong. If he knew these acts were wrong and did them anyway, he is not fit to practice law. If he did not know such acts were wrong, he is not fit to practice law.

Under all of the facts and circumstances of this case, any result other than disbarment would be unconscionable.

STAFFORD, C.J., and FINLEY and BRACHTENBACH, JJ., concur with WRIGHT, J.

UTTER, J. (dissenting)—The events comprising "Watergate" have left a dismayed and shaken public, profession and judiciary as a part of their legacy. Dismay, anger and a wish to prevent a repetition of these events are natural but make it difficult to obtain the perspective so necessary to the dispensation of justice. In past times of crisis, courts have, unfortunately, not always shown the ability to remove themselves sufficiently from the emotions of the times to render what history has since understood to be

considered justice.[4] I am not concerned here with what history will say, however, but rather with what I believe to be a grave injustice to an individual achieved by our actions in this case. I believe the majority is, in effect, adding one wrong to another in an attempt to make a right.

I reach this conclusion for several reasons. The majority summarily rejects the uncontested finding of fact by the bar hearing panel that Mr. Krogh is unlikely to repeat his unlawful conduct. The record is replete with evidence that his misconduct is unlikely to recur and, lacking the benefit of face-to-face examination of the witnesses the hearing panel enjoyed, we should adhere to the reasons behind our established case law and accept this finding of fact. The majority also relies on matters outside the record and guilt by association to buttress its decision. This is a dangerous and intolerable way to justify a judicial conclusion. Lastly, the majority places too much emphasis on the fact that respondent's action has been labeled as a felony involving moral turpitude as a justification for its judgment of disbarment. While we have disbarred in other cases where misconduct has been found to meet these technical requirements, we have not viewed them as a substitute for the principle of individualized justice to which we should always adhere, with protection of the public and preservation of confidence in the legal system as our guide.

Suspension of respondent for a period of time may be appropriate. Disbarment, however, under the facts of this case, will not preserve but will in the long run undermine the confidence of the public in the ability of the legal profession to give individualized justice.

There is no disagreement here that what respondent Krogh did was both wrong and criminal; he has admitted that it was and a court has determined it was in a judgment that is conclusive on us. He has served a prison sen-

---

[4]See *Korematsu v. United States*, 323 U.S. 214, 89 L. Ed. 194, 65 S. Ct. 193 (1944); *Debs v. United States*, 249 U.S. 211, 63 L. Ed. 566, 39 S. Ct. 252 (1919).

tence imposed by that court for his crime. But Krogh's culpability is not the end of our inquiry but the beginning. The question in a disbarment case is not so much what the respondent attorney did, or why or whether he should have done it, as what, if anything, his actions indicate about his fitness to continue in the practice of law. The facts of this case which concern Krogh's illegal acts, his felony conviction, and the institution of these proceedings are not disputed by the parties or contradicted on the record. Yet, despite the majority's lengthy recitation of them, it is not these facts that are determinative in our disposition of this case. Rather, the facts that should concern us here are those which go directly to the respondent's qualities as a person and a lawyer. In the array of information in the record before us which is relevant to this question, the isolated incidents which led to his felony conviction are only a single, though highly significant, item.

The bulk of this information, and of the record in this case, consists of statements of opinion regarding Krogh's professional and personal attributes and abilities, buttressed by descriptions of his behavior in several circumstances which demonstrate them. This testimony is uniformly, even remarkably, laudatory of him. It came from almost a score of witnesses, many of them lawyers of the highest standing in our bar and those of other states, who stated that their experience with him indicated to them that, in spite of his serious mistake, Krogh is manifestly fit and able to continue in the practice of law. The majority's attempt to discount this evidence by baldly stating that "[f]ew of the witnesses seemed to consider the respondent's crime a serious one or to contemplate that it might indicate the presence in his character of qualities inappropriate in a member of the bar" is an unsupportable affront to the integrity and character of these individuals. It cannot obscure the fact that the hearing panel, which had the opportunity to hear their testimony directly, found the facts they swore to be true and inferred, I think properly, that they were fully

aware of the gravity of the offense but were also aware of redeeming qualities in Mr. Krogh. It, unlike the majority opinion, adhered to the uncontradicted evidence on the record in finding that he

> has a spotless record except for the incident giving rise to the present proceedings; that he is outstanding in character and ability; that his reputation is beyond reproach; that he acted, although mistakenly, out of misguided loyalty to the President of the United States; that the event was an isolated one; and that in all probability there will be no repetition of any such error on his part.

This finding, adopted by the disciplinary board, should be central to our decision, yet the majority chooses to ignore or reject it by denigrating the panel's sources, or by simply disagreeing with its conclusions as it does with respect to the specific determination that Krogh is unlikely to repeat his unlawful conduct. Contrary to the majority's contention, the record is replete with evidence in support of this latter finding. This includes not only statements of opinion but also descriptions of particular events which demonstrate his fitness to practice law despite his transgression: his violation of an illegal presidential order apparently designed to prevent him from revealing the facts of the break-in conspiracy to its victims, the courts and the Watergate special prosecutor; his abandonment and denunciation of the spurious "national security" defense in his unbargained-for guilty plea; and his intervention on behalf of a group of native American demonstrators who, like Dr. Ellsberg, had incurred the administration's wrath and were in danger of both the deprivation of rights and physical injury in a planned attempt to put a stop to their protest.

The majority justifies its skepticism of this finding by stating that Krogh's remorse came "—only, it seems, after it became evident that in spite of all the efforts of the administration to conceal them, the investigative activities conducted in and by the White House were going to be exposed." This completely ignores the fact that he refused to authorize a wiretap on one Yeoman Radford after the

Fielding break-in at a time when there was no public revelation of his activities and that it was this refusal that probably terminated his work with the special investigations unit. That action was clearly not grounded on expediency but on an apparently growing awareness of the moral and legal issues involved. The fact is that the findings of the hearing panel are supported by the testimony and the attempt by the majority to alter them is a serious disservice to respondent, to history, and to the hearing panel which found the facts in this case.

In disciplinary proceedings as in any appeal, appellate courts are in a poor position to find facts for themselves. The bar disciplinary system includes hearings and findings by the hearing panel in order to apprise this court of the facts of the case without our having to hear testimony and sift unrefined evidence ourselves.

> In disciplinary actions this court will not ordinarily disturb the panel's . . . findings of fact made upon conflicting evidence. The panel, before which the witnesses appear, is in a much better position to evaluate the testimony than we can possibly be from reading the record, complete though it is. *In re Little, supra,* [40 Wn.2d 421, 244 P.2d 255 (1952)]; *In re Foster,* 40 Wn.2d 1, 239 P.2d 1060 (1952); *In re Thacker,* 35 Wn.2d 605, 618, 214 P.2d 507 (1950).

*In re Kennedy,* 80 Wn.2d 222, 230, 492 P.2d 1364 (1972). Although this court theoretically retains the power to overturn findings of fact by the board and panel below (*see In re Caffrey,* 63 Wn.2d 1, 4, 385 P.2d 383 (1963); *In re Simmons,* 59 Wn.2d 689, 701, 369 P.2d 947 (1962)), it is senseless to exercise that power where nothing is served thereby but the negation of the function of the established factfinding procedures and the *diminution* of the credibility of the basis for our decision. In logic, if not technically in law, at least where they are not disputed by the parties or contradicted on the record, "the findings [of the panel and board] must be accepted by us as verities." *In re Ward,* 54 Wn.2d 593, 597-98, 343 P.2d 872 (1959).

Even more disquieting is the obvious impact on the majority's decision of facts and allegations not contained in this record at all. However "common" is the knowledge that the "reputation and honor of the bar have suffered" from the actions of attorneys acting as high executive officials in the late Nixon administration, that information is not contained in the record of this disciplinary action, and no opportunity has been afforded respondent to contest that fact or this court's placing of responsibility on him for it. It is not clear to me from this record how much, if at all, respondent's behavior has contributed to any recent decline in public regard for the legal profession. Whether the public is familiar or wants to be familiar with Mr. Krogh's actions, whether it shares the majority's opinion of them, whether public opinion is the result of an objective knowledge of the evidence or of the distortion and confusion as to precise details inevitable in a 2-year long political scandal and outrage—none of these questions are answered by the record before us.

The penalties provided for misconduct by the members of the bar are severe, and proceedings to determine guilt or innocence of disciplinary rules violations or the penalty therefor must comport with the requirements of due process. *In re Ruffalo*, 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968); *In re Metzenbaum*, 22 Wn.2d 75, 79-80, 154 P.2d 602 (1944). It is not consistent with due process to go beyond the record in a case and deprive a party of a valuable right on the basis of "judicially noticed" information that has not been proven and which he has had no opportunity to question or rebut. *Ohio Bell Tel. Co. v. Public Util. Comm'n*, 301 U.S. 292, 81 L. Ed. 1093, 57 S. Ct. 724 (1937); *State ex rel. Huff v. Reeves*, 5 Wn.2d 637, 642-43, 106 P.2d 729, 130 A.L.R. 1465 (1940). It is not consistent with due process to impose "guilt by association" on an individual by penalizing him for events which have not been shown to be the result of his acts or acts of others which are ascribed to him. *Cf. Schware v. Board of Bar Examiners*, 353 U.S. 232, 246, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957).

The disciplinary board's recommendation that respondent should be disbarred should be reviewed only in light of the factual record before us, which has been compiled with the safeguards of the rules of evidence and which he has been given the opportunity to examine and contest. Going beyond that record for unproven facts of questionable relevance which have not even been shown to have anything to do with respondent's conduct is improper and unfair and can hardly do much to restore public confidence in the honesty of the bar or the integrity of the judicial system.

Limiting our decision to the record before us, what the record shows, other than that many attorneys and other citizens hold the highest regard for Mr. Krogh as a person and a lawyer, is the fact of his illegal conduct and his ultimate guilty plea to criminal charges of conspiracy to violate civil rights. The majority opinion seems to treat the latter aspect of the case as nearly conclusive, edging close to the position of *Ex Parte Wall*, 107 U.S. 265, 27 L. Ed. 552, 2 S. Ct. 569 (1882), that conviction of a felony requires automatic disbarment. But under our decisions and rules, a criminal conviction, even one of a felony involving "moral turpitude," does not absolve us of the responsibility to form and impose a sanction which is just and justifiable in each individual case.

Our disciplinary rules attach significance to a criminal conviction only by treating it as conclusive proof of the fact of the wrongful behavior. Indeed, DRA 1.1(a) specifically states that criminal conviction is neither a "condition precedent to disciplinary action" nor a fact which precludes further consideration of punishment in a DRA 3.2 hearing. Our prior decisions have been consistent with this principle, and we have not differentiated between cases in which criminal behavior resulted in a conviction and others in which similar misdeeds resulted only in disciplinary proceedings.[5] Misconduct by attorneys resulting in criminal

[5]*Compare In re Garvin*, 78 Wn.2d 832, 479 P.2d 930 (1971) (conduct "amounting to 'embezzlement . . .'" from estate, no criminal conviction), *with In re Johnson*, 74 Wn.2d 21, 442 P.2d 948 (1968) (embezzle-

conviction has been held to warrant the same full range of sanctions available for noncriminal misconduct, dependent, in each case, on the particular facts and circumstances involved. *See, e.g., In re Seijas,* 52 Wn.2d 1, 318 P.2d 961 (1957) (tax fraud conviction-disbarment); *In re English,* 64 Wn.2d 129, 390 P.2d 999 (1964) (tax evasion conviction-suspension); *In re Molthan,* 52 Wn.2d 560, 327 P.2d 427 (1958) (tax evasion conviction-suspension).

Nor is the rule any different where the criminal conviction happens to be of a felony rather than a misdemeanor. DRA 1.1(a) clearly abjures any distinction between conduct which is felonious and that which is otherwise criminal or "illegal." Although, as the majority notes, we have apparently found disbarment warranted in all cases which have involved felony convictions, our judgments in such cases have not always been summary or unanimous.[6] Virtually all of them involved misbehavior in the course of employment as an attorney,[7] or in a position of trust closely

---

ment from estate, criminal conviction); *In re Hall,* 73 Wn.2d 401, 438 P.2d 874 (1968) (misappropriation of trust funds, no criminal conviction), *with In re Dillard,* 48 Wn.2d 376, 293 P.2d 761 (1956) (misappropriation of trust funds, criminal conviction); *In re Caffrey,* 71 Wn.2d 554, 429 P.2d 880 (1967) (subornation of perjury, no criminal conviction), *with In re Bixby,* 31 Wn.2d 620, 198 P.2d 672 (1948) (subornation of perjury, criminal conviction).

[6] For example, in *In re Simmons,* 65 Wn.2d 88, 395 P.2d 1013 (1964), the respondent attorney had been convicted of assault with intent to rape, but his conviction was reversed on appeal. *See State v. Simmons,* 59 Wn.2d 381, 368 P.2d 378 (1962). Although there is nothing in the disciplinary rules which differentiates between felony convictions which are reversed on appeal and those which are not, the court did not rest its judgment of disbarment on the fact of the conviction or the alleged conduct underlying it. Instead, the respondent was disbarred for statements he made about various state and county officials. *In re Simmons, supra* at 99. In *In re Liliopoulos,* 175 Wash. 338, 343, 27 P.2d 691 (1933), although the respondent attorney had been convicted of grand larceny of a client's funds, Holcomb, J. dissented from the judgment of disbarment arguing that suspension "would answer every purpose, to the public, the profession, and the court."

[7] *See, e.g., In re Anderson,* 73 Wn.2d 587, 439 P.2d 981 (1968) (grand larceny of client's funds); *In re Hett,* 70 Wn.2d 435, 423 P.2d 629 (1967) (aiding client's unlawful flight); *In re Wallis,* 63 Wn.2d 833, 389

related to the respondent's status as such,[8] which would have called for disbarment regardless of the criminal conviction. The few cases we have heard which involved felonies which, like this one, were unrelated to the respondent's professional status are dated and largely uninstructive;[9] courts in other jurisdictions with broader experience under rules similar to ours, however, have frequently found disbarment unwarranted in such cases. *See, e.g., In re Alkow*, 64 Cal. 2d 838, 415 P.2d 800, 51 Cal. Rptr. 912 (1966) (manslaughter); *In re Rothrock*, 16 Cal. 2d 449, 106 P.2d 907 (1940) (assault with a deadly weapon); *In re*

---

P.2d 421 (1964) (embezzlement of client's funds); *In re Dalton*, 60 Wn.2d 726, 375 P.2d 258 (1962) (grand larceny of client's funds); *In re Bixby*, 31 Wn.2d 620, 198 P.2d 672 (1948) (subornation of perjury); *In re Liliopoulos*, 175 Wash. 338, 27 P.2d 691 (1933) (grand larceny of client's funds); *In re Comyns*, 132 Wash. 391, 232 P. 269 (1925) (mail fraud conspiracy with clients). In a few cases our records do not show whether or not the criminal conduct was in the course of business as an attorney. *In re Burns*, 13 Wn.2d 199, 124 P.2d 550 (1942); *In re Wrabek*, 113 P.2d 526 (Wash. 1941).

[8]*See, e.g., In re Johnson*, 74 Wn.2d 21, 442 P.2d 948 (1968) (embezzlement from incompetent's estate by attorney-guardian); *In re Timothy*, 58 Wn.2d 153, 361 P.2d 642 (1961) (grand larceny of estate funds by attorney-administrator); *In re Dillard*, 48 Wn.2d 376, 293 P.2d 761 (1956) (misappropriating funds of ward by attorney-guardian); *In re McCoy*, 20 Wn.2d 884, 146 P.2d 818 (1944) (embezzlement of fines and falsifying of public records by attorney serving as Justice of the Peace).

[9]In *In re Seijas*, 52 Wn.2d 1, 318 P.2d 961 (1957), where the respondent was convicted of tax fraud, we relied exclusively on the determination of other courts in other contexts that such a crime involved "moral turpitude." *In re Finch*, 156 Wash. 609, 287 P. 677 (1930) involved a conviction for conspiracy to sell illegal liquor; there, too, we simply, rather mechanically, applied a formula for "moral turpitude." The respondent in *In re Barnett*, 35 Wn.2d 191, 211 P.2d 714 (1949), who was convicted of sale of narcotics, apparently did not contest the disbarment recommendation. And *In re Wells*, 121 Wash. 68, 208 P. 25 (1922), in which the respondent was disbarred for his involvement in a "conspiracy to hinder the war effort" by distributing literature opposing the draft, is an historical anomaly of obviously doubtful constitutional validity (*see Brandenburg v. Ohio*, 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969); *Bond v. Floyd*, 385 U.S. 116, 17 L. Ed. 2d 235, 87 S. Ct. 339 (1966)) and consequently entitled to little weight as authority.

*Morris,* 74 N.M. 679, 397 P.2d 475 (1964) (involuntary manslaughter); *In re Abramson,* 37 App. Div. 2d 301, 324 N.Y.S.2d 891 (1971) (tax fraud); *State v. Postorino,* 53 Wis. 2d 412, 193 N.W.2d 1 (1972) (gambling); *Re a Solicitor; Ex Parte Incorporated Law Soc'y,* 61 L.T.R. (n.s.) 842 (Q.B. 1889) (embezzlement outside duties as a solicitor). Thus, although we never have held that felonious misconduct did not require disbarment, neither have we adopted "as ironclad rule so that it followed, 'as the night the day,' that any member of the bar who [is] convicted of a felony would be disbarred . . ." *In re Evers,* 41 Wn.2d 942, 247 P.2d 890 (1952) (Hill, J., dissenting).

The irrelevance of any distinction between a felony and a misdemeanor is particularly evident in this case. Respondent Krogh was convicted of conspiracy to violate civil rights under 18 U.S.C. § 241, which is a felony. But conspiracy is only a misdemeanor at common law, which our statutes codify. *See* RCW 9.22.010; R. Perkins, *Criminal Law* 613 (2d ed. 1969). Conspiracies are generally chargeable as felonies or misdemeanors under federal law (*Williams v. United States,* 238 F.2d 215 (5th Cir. 1956), *cert. denied,* 352 U.S. 1024 (1957)), and under the law of California, where the object of this conspiracy was carried out. Cal. Penal Code § 182 (West 1969). Had respondent been tried in California and convicted of conspiracy to commit burglary, the status of the offense would have depended on the sentence given him. *People v. Hamilton,* 33 Cal. 2d 45, 198 P.2d 873 (1948). It could not be more obvious than it is on this record that "[t]hat the act may or may not be a misdemeanor or a felony, is purely coincidental." *In re Morris,* 74 N.M. 679, 683, 397 P.2d 475 (1964).

Nor even can the further determination that respondent's crime involved "moral turpitude" serve as a substitute for a reasoned judgment in this case. The definition of "moral turpitude," " '[e]verything done contrary to justice, honesty, modesty, or good morals . . .' " (*In re Comyns,* 132 Wash. 391, 394, 232 P. 269 (1925); *In re Finch,* 156 Wash.

609, 611, 287 P. 677 (1930)), is exceedingly vague and broad, arguably encompassing almost everything that could conceivably result in bar discipline. Certainly where a crime is involved, especially a felony, the concept of "moral turpitude" adds nothing to the analysis of the case and the determination of the disciplinary action that is appropriate: it is difficult to imagine "what kind of a felony could be considered as not being 'contrary to honesty, justice or good morals.'" *In re Morris*, 74 N.M. 679, 683, 397 P.2d 475 (1964). At least in a case like this, "moral turpitude" can serve only as a conclusory label for a judgment arrived at through consideration of some other factor or factors. And even as such, under our rules it can only purport to justify the imposition of *some* discipline; an attorney who commits an "act involving moral turpitude" can be "censured, reprimanded, suspended, or disbarred" for it. DRA 1.1.

Thus, neither the fact that the respondent has been criminally convicted, nor the fact that the crime he was convicted of was a felony, nor the conclusion that it involved "moral turpitude," except this case from the often-repeated rule that "there is no fixed standard by which the result of a disciplinary proceeding can be determined." *In re Steinberg*, 44 Wn.2d 707, 715, 269 P.2d 970 (1954); *In re Ward*, 54 Wn.2d 593, 600, 343 P.2d 872 (1959). For Mr. Krogh's notorious misconduct, just as for misdeeds by lawyers less well known,

> The challenge for this court is to fashion a suitable remedy in each case before us to accomplish these goals [of bar discipline] and insure that individualized justice is dispensed. The action appropriate in a given case can only be determined by its particular facts and circumstances.

*In re Livesey*, 85 Wn.2d 189, 193, 532 P.2d 274 (1975).

The accepted purposes of bar discipline are the preservation of confidence in the profession and the protection of the public. In deciding what disciplinary action is required in a given case, we must consider "the seriousness and circumstances of the offense, the need to avoid repetition,

deter others from similar misdeeds, maintain respect for the honor and dignity of the legal profession, and assure that those who seek legal services will be insulated from unprofessional conduct." *In re Livesey, supra* at 193; *In re Smith*, 83 Wn.2d 659, 663, 521 P.2d 212 (1974).

There is no question that Krogh's offense was serious and was not justified by the surrounding circumstances; he admits, as he must, that "it struck at the heart of what this Government was established to protect, which is the individual rights of each individual."[10] But, as noted above, consideration of the seriousness of the offense and the lack of justification or excuse for it is only the departure point for our determination and provides no guidance as to the proper sanction to be imposed. Other factors must finally control our decision of that ultimate question.

"Avoidance of repetition" is not at issue here at all, although the majority attempts to make it so. The hearing panel found, on substantial evidence, that repetition was unlikely even if respondent were again to hold similar public office; the majority rejects that finding, totally without justification. But in the final analysis, the whole question is irrelevant: the issue before us is Mr. Krogh's fitness to practice law, not to act as a White House Aide. Although his prospects of again holding such office are dim, they are unaffected by our judgment in this case. His ability to use his expertise in governmental affairs remains undiminished by whatever action we take. The extensive evidence presented to the hearing panel assured them it was unlikely Mr. Krogh would repeat his past transgressions. The hearing panel evidenced no fear that these past mistakes would impair his ability to effectively discharge the duties and

---

[10]It is ironic that, in this aspect of its decision, the majority relies on *In re Brooks*, 57 Wn.2d 66, 355 P.2d 840 (1960), a case in which this court held that an individual's refusal to comply with official governmental orders which he believed to be immoral and unconstitutional made him morally unfit for admission to the bar. Here we have a lawyer accused of the opposite sin, of failing to refuse to take actions which we find objectionable on those same grounds.

responsibilities of public office in the future. By keeping him from practicing law we cannot prevent him from taking official positions of authority for which no bar membership is required. The majority's rejection of the hearing panel findings is thus not only improper but also pointless.

Deterrence is a valid and important concern, but I do not believe that even the harsh judgment of disbarment that the majority imposes adds much to the deterrent effect of the public disgrace, loss of prospects for further governmental office, and criminal sentence that Mr. Krogh has already received. Lawyers and others in official positions have been educated by what already has happened to him, and will have reason to refrain from similar conduct. They should learn from watching and reflecting on his experience that such illegal activities are unacceptable in a democratic society in which the rule of law, rather than men, applies to those in the highest positions of government as well as its other citizens. If they have not come to understand that, perhaps at least the losses respondent and his colleagues have already suffered will make them fear to repeat their mistakes. If what has already happened has not achieved this result, however, I doubt we can do so through any action we take.

These considerations leave the need to uphold the honor and dignity of the profession as the sole ground for imposing sanctions on Mr. Krogh. Certainly the honor of the profession can be enhanced by casting persons the public believes to be wrongdoers out of it. But I believe that, in the last analysis, it is the fair adjudication of all cases, including bar discipline cases, which is most crucial to the honor of the profession. "[B]oth the bench and bar are on trial before the public in all disciplinary actions." *In re Haglund*, 81 Wn.2d 118, 123, 500 P.2d 84 (1972) (Stafford, J., dissenting). We do not best acquit ourselves by considering, in a decision to disbar an attorney, the fact that "the vast majority of the people" who admittedly "do not have . . . [an] intimate knowledge of the respondent

and his character" disapprove of his conduct or that of his colleagues.[11] We do not best acquit ourselves by imposing a sanction which is excessive in relation to the purposes of bar discipline and which imposes unnecessary punishment on the offending attorney.[12] The restoration of public confidence requires that in this case, as in any other, we fashion our judgment in a reasoned resolution of the legitimate affected interests of the people, the bar, and the transgressing attorney.

Because his crime was serious, because it is necessary to discourage other members of the bar from similarly forgetting the priorities of the constitution in a fervor for law enforcement at all costs, because there is a difference between the violation of constitutional rights by a layman and similar acts by a lawyer, Mr. Krogh should not go without discipline. But, in view of the losses he has suffered and the probability that he can best make them up and compensate somewhat for his misdeeds in the private practice of law, the ultimate sanction of disbarment is inappropriate. The hearing panel's recommendation that Krogh be suspended from practice for 9 months, "would answer every purpose, to the public, the profession, and the court." *In re Liliopoulos*, 175 Wash. 338, 343, 27 P.2d 691 (1933) (Holcomb, J., dissenting). We have recently accepted the recommendation of the hearing panel and rejected a more severe recommendation of the disciplinary board after weighing all the factors in the case. *In re Greenlee*, 82 Wn.2d 390, 510 P.2d 1120 (1973). I believe, for the reasons stated, we should do the same here.

---

[11]By far the most serious source of public dissatisfaction with the legal profession is the impression that lawyers are greedy and overcharge. Thomason, *What the Public Thinks of Lawyers*, 46 N.Y.S. B.J. 151, 152-54 (1974). Yet in "excessive fees" cases we have imposed only the lightest sanctions. *See, e.g., In re Greer*, 61 Wn.2d 741, 380 P.2d 482 (1963).

[12]*Cf. In re Greiner*, 61 Wn.2d 306, 318, 378 P.2d 456 (1963) (Rosellini, J., dissenting):

"There appears to be no relation between the act of discipline and the evil which is attempted to be prevented. It seems to be a blind desire to obtain a pound of flesh for a wrong committed."

In order that the dissent may be understood in its intended sense, it is appropriate to make certain additional observations. It should first be made clear that the dissent was not written as a personal rebuke but rather a statement of reasons for disagreeing with arguments advanced in the majority opinion.

The concurring opinions were prepared subsequent to the writing of the majority and dissent. I appreciate and agree with Justice Wright's concern that all members of the bar, both prominent and obscure, be accorded the same treatment. We did, in *In re Caughlan*, 61 Wn.2d 557, 379 P.2d 189 (1963), a nonfelony case, consider in arriving at the proper discipline to be imposed for failure to file income tax returns, the numerous commendable things he had done as well as his admittedly serious offense. It was my hope that we could apply that same principle here. The lack of emphasis on the separate judgment of the disciplinary board in my dissent stems from the fact that, except in its recommendations as to punishment, the board adopted the panel's findings and conclusions in full. No reason was given for the changed result, no additional evidence was taken which could explain it. It was, therefore, impossible to give special deference to, or even knowledgeably discuss, the disciplinary board's recommendation.

The issue is not whether courts should be permissive or firm. No hint of permissiveness in the handling of Mr. Krogh's case can be found at any level. This is true whether we consider his sentence to prison by the federal court or his immediate suspension from the practice of law by this court. What is at stake is whether we remain true to our basic principle of individualized justice with the protection of the public and preservation of confidence in our legal system as a guide. Because I believe the majority fails to accomplish this, I dissent.

HOROWITZ, J., concurs with UTTER, J.

HOROWITZ, J. (concurring in the dissent)—I have signed Justice Robert Utter's dissent. I agree with him the record contains ample evidence to support the necessary findings of the hearing panel accepted by the disciplinary board. I agree also the panel's recommendation for suspension rather than disbarment is fully supported by those findings.

The Supreme Court in a unanimous opinion very recently recognized the necessity for individualized justice in disciplinary proceedings of a member of the bar. *In re Livesey*, 85 Wn.2d 189, 193, 532 P.2d 274 (1975). In fulfilling the requirements of individualized justice in determining whether the discipline to be imposed should be censure, reprimand, suspension or disbarment, the court must look beyond the misconduct charged to the conduct of the whole man in order to ascertain the kind of man he is, all things considered. *In re Caughlan*, 61 Wn.2d 557, 379 P.2d 189 (1963). Since a lawyer may be disciplined for conduct outside as well as inside the profession, (DRA 1.1(a)), fairness requires that commendable conduct outside the respondent's relationship as an attorney be given proper and substantial weight in determining the nature of the discipline to be imposed.

To protect the public and promote confidence in the legal profession and in the judicial system, this court has heretofore listed the factors to be considered in imposing discipline. In *In re Little*, 40 Wn.2d 421, 430-31, 244 P.2d 255 (1952), the court stated:

> Among these are the motives and purposes which actuated his misconduct and the lack of gravity or serious consequences of it, his attitude toward the proceeding against him, his experience and training, his general characteristics and nature, his previous good record, and the likelihood and probability that he will not again transgress. These subjects of consideration do not excuse improper conduct. They only aid the court in arriving at a fair and moderate determination of the necessary discipline which duty requires it to impose.
>
> The action to be taken rests within the sound discretion of the court. This discretion is wide, and, as is true

in every instance where it has no well-defined boundary, it must be exercised with extreme care and caution to avoid its abuse. Its limits in each case are determined by the evidence then before the court. The final adjudication should provide neither more nor less than the facts fairly require to penalize the offender, deter others, and indicate to laymen and members of the bar that proper discipline will be enforced and the standards of the profession maintained.

Under the discipline rules for attorneys kept currently updated, procedures are provided for charges to be preferred, hearing to be had thereon before a hearing panel empowered to take sworn testimony, followed by the entry of the hearing panel's findings, conclusions and recommendations. Provision is also made for review of the hearing panel's findings, conclusions and recommendations. Such a review is conducted by the disciplinary board based on the record made before the hearing panel. The disciplinary board is empowered to change any finding, conclusion or recommendation of the hearing panel. DRA 3.2; 5.4; 5.6. Later when the Supreme Court functions in disciplinary proceedings, it gives great weight to the actions of the hearing panel and the disciplinary board, particularly the findings and conclusions entered. It is the hearing panel, not the Supreme Court, that hears and observes the witnesses testifying. Accordingly, "[i]n disciplinary actions this court will not ordinarily disturb the panel's . . . findings of fact made upon conflicting evidence." *In re Kennedy*, 80 Wn.2d 222, 230, 492 P.2d 1364 (1972). It is true the court need not accept the findings and conclusions. Unless, however, there is good and sufficient reason for doing so, the findings and factual conclusions supported by substantial evidence, even if that evidence is conflicting, will not be rejected.

Here the following significant findings and conclusions, factual in nature, were entered by the hearing panel and remained unchanged by the disciplinary board.

The Panel further finds that the respondent attorney has a spotless record except for the incident giving rise to

the present proceedings; that he is outstanding in character and ability; that his reputation is beyond reproach; that he acted, although mistakenly, out of misguided loyalty to the President of the United States; that the event was an isolated one; and that in all probability there will be no repetition of any such error on his part.

Finding of fact No. 6.

The Panel further finds that respondent attorney has accepted responsibility and made amends to the best of his ability; that he has testified fully and candidly; and that his attitude in this proceeding has been excellent.

Finding of fact No. 7. The conclusions reached by the panel include the following:

It is the unanimous opinion of the Panel that the circumstances surrounding and leading to Mr. Krogh's felony conviction are unique in character and factually distinguishable from other cases resulting in disbarment. In the present case Mr. Krogh apparently followed the unmistakable order of a somewhat distraught President of the United States under the guise of national security to stop, by all means, further security leaks. The evidence further shows, and so freely admitted by Mr. Krogh, that his conscience at that time and for some time thereafter was not alert enough to refuse participation in the unlawful activities involving Drs. Fielding and Ellsberg, and to recognize that national security was not a lawful justification for such operation.

Conclusion No. 11.

The hearing panel also concluded:

The unanimous conclusion of the Panel, in view of the foregoing and of all of the evidence, the circumstances, and the entire record of Mr. Krogh, is that respondent should be subjected to discipline but should be retained as a member of the Bar, and that the disciplinary sanction of suspension is sufficient.

Conclusion No. 10.

The hearing panel then recommended that the respondent be suspended from the practice of law for a period of 9 months in addition to the suspension automatically ordered on February 4, 1974, based upon his conviction of the

offense involved in the present proceeding. In addition, the panel recommended that if on review the disciplinary board should modify the panel recommendations and recommend disbarment, that the Supreme Court give favorable consideration to

> reinstatement of Mr. Krogh at the earliest possible date since the Panel unanimously believes that the circumstances leading to Mr. Krogh's conviction were collectively an isolated event in his life, most likely due to his inexperience and youth and somewhat unusual atmosphere that permeated some of the White House personnel at that time.
>
> The Panel further believes that the public interest and the integrity of the profession will not be jeopardized in any way by such an early reinstatement. The Panel also believes that Mr. Krogh's collective experience gained during his White House and other government career including his conviction, will tend to make him a more useful and productive member of society.

A reading of the record demonstrates the record contains ample support for the quoted findings and conclusions entered. Based on those findings and conclusions, the record provides ample support for the hearing panel's recommendations reached on the basis of the principles of law that must govern such proceedings. The disciplinary board's recommendation, based on the findings and conclusions it accepted without change, is unaccompanied by a statement of reasons from which to determine the adequacy of such reasons particularly with respect to unchanged findings, including finding of fact No. 6.

The majority opinion reaches its conclusions concerning the discipline to be imposed by dealing principally with respondent's relationship to and participation in the break-in of Dr. Fielding's office. Concerning that matter, respondent testified fully, candidly, and honestly. That testimony dealt with a detailed history of his participation and of the circumstances leading up to it. There can be little question that his participation was motivated by an honest belief that what he was asked to do by those representing the

President of the United States concerned the urgent necessity of preventing the leak of confidential information concerned with national security. After a rigorous cross-examination, counsel for the bar stated to the hearing panel:

> By court rule bar counsel properly may not make a recommendation for this panel, but I would be remiss if I did not say that I have been impressed by Mr. Krogh's candor and his explanation of his role in the incident that brings this matter before the panel.

The panel agreed. Finding of fact No. 7.

In the majority opinion dealing with the evidence certain statements are made which in my view do not fairly reflect the record. Furthermore the majority relies on matters not contained in the record. These matters have been dealt with in the dissenting opinion and I need make no further reference to them. There is one matter, however, to which specific reference should be made. The majority opinion rejects the finding entered by the panel, and with no change by the disciplinary board "that in all probability there will be no repetition of any such error on his part." It is said there is no evidence to support that finding. My own reading of the record leads me to an opposite conclusion. In that same connection the opinion briefly refers to respondent's "commendable qualities and achievements." However, the opinion fails to give proper weight to them in determining the discipline to be imposed. I will simply state that after reading the evidence, and the hearing panel's findings, conclusions and recommendations, amply supported by the evidence, I agree with the recommendations of the hearing panel.

UTTER, J., concurs with HOROWITZ, J.

Petition for modification denied August 12, 1975.